## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DEBRA SIMPKINS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, N.A., WELLS FARGO INSURANCE, CO., ASSURANT, INC. and AMERICAN SECURITY INSURANCE COMPANY,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.     This class action is brought by Plaintiff Debra Simpkins ("Plaintiff") individually and on behalf of all persons who have or had residential mortgage loans originated and/or serviced by Defendant Wells Fargo Bank, N.A. ("WFBNA") which at times does business as Wells Fargo Home Mortgage ("WFHM") and, in connection therewith, were required to pay for lender-placed or "force-placed" hazard insurance policies provided by Defendants Assurant, Inc., ("Assurant, Inc."), American Security Insurance Company ("ASIC") and/or other force-placed insurance provider subsidiaries of Assurant, Inc. (collectively, "Assurant") which involved the payment of a commission, fee, kickback and/or reinsurance premium to a WFBNA affiliate including but not limited to Defendant Wells Fargo Insurance, Inc. ("WFI"). WFBNA, WFHM and WFI are collectively referred to herein as "Wells Fargo" and together with Assurant, Inc. and ASIC are collectively referred to as "Defendants."

2.     In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, Defendants replaced borrowers' policies with more expensive policies provided by Assurant pursuant to a contract between Wells

Fargo and Assurant and forced the borrowers to pay for the policies by diverting the monthly mortgage payments and/or debiting the borrowers' escrow accounts. These policies are known as "force-placed" or "lender-placed" insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing improper, undisclosed, and lucrative financial benefits to lenders/servicers and/or their affiliates, as well as to providers of force-placed insurance. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has no risk of loss.

3.      As one journalist observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions. Policies are sometimes backdated to cover periods that have already passed.
>
> In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that.

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011) (formerly available at: http://www.star-telegram.com/2011-10-01-2312434/everyone-profits-off-force-placed.html), attached hereto as Exhibit 1.

4.      Recently, the force-placed insurance practices of lenders, servicers and insurance companies have come under increased scrutiny. The New York Department of Financial Services recently opened an investigation into the force-placed insurance industry. Superintendent Benjamin N. Lawsky noted that the Department's initial inquiry uncovered "serious concerns and red flags" which included: (1) exponentially higher premiums for force-

placed insurance than regular homeowners insurance; (2) extraordinarily low loss ratios; (3) harm to distressed borrowers; (4) lack of competition in the market; (5) force-placed insurance has become a major profit center for both banks and insurers; and (6) "tight relationships between banks, their subsidiaries and insurers." As Superintendent Lawsky summarized, the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little. In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies. Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

> \*     \*     \*

> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions....

*Force-Placed Insurance Hearings: New York Department of Financial Services* (May 17, 2012) (Opening Remarks of Benjamin M. Lawsky, Superintendent of Financial Services), attached hereto as Exhibit 2; *see also Under Interrogation,* American Banker (Jan. 27, 2012), available at http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html, attached hereto as Exhibit 3; *Flurry of Subpoenas Raises Force-Placed Stakes*, American Banker (Jan 27, 2012), http://www.americanbanker.com/issues/177_19/force-placed-insurance-subpoenas-probe-1046157-1.html; Gretchen Morgenson, *Hazard Insurance With Its Own Perils,* N.Y. Times (Jan. 21, 2012), available at http://www.nytimes.com/2012/01/22/business/hazard-insurance-with-its-own-perils-fair-game.html, attached hereto as Exhibit 4.

     5.    The New York Department of Financial Services conducted hearings in furtherance of its investigation on May 17, 18 and 21, 2012, during which fact-finding regarding the force-placed insurance practices of Assurant and its lender/servicer partners were among the

topics addressed by witnesses and in written testimony. *See, e.g., New York Department of Financial Services: April 12, 2012 Notice of Public Hearings, issued pursuant to N.Y. Financial Services Law §§ 305 and 306 and the Department's Request for Written Testimony Pursuant to N.Y. Insurance Law § 308* (testimony of John Frobose, President American Security Insurance Company, attached hereto as Exhibit 5) ("Frobose NYDFS Testimony"); *New York State Department of Financial Services, Financial Frauds & Consumer Protection Division, Public Hearing on Lender Placed Insurance* (May 3, 2012) (testimony of Robert A. Segnini) ("Segnini NYDFS Testimony"); *New York Department of Financial Services: Public Hearing on Force-Placed Insurance* (May 21, 2012) (testimony of Birny Birnbaum on behalf of the Center for Economic Justice, attached hereto as Exhibit 6) ("Birnbaum NYDFS Testimony"); and *New York Department of Financial Services on Force-Placed Insurance in New York* (May 17, 2012) (testimony of J. Robert Hunter, Director of Insurance, attached hereto as Exhibit 7) ("Hunter NYDFS Testimony"); *see also* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at F-83, attached hereto as Exhibit 8 (noting that "on February 7, 2012, the company and two of its insurance subsidiaries (American Security Insurance Company and American Bankers Insurance Company of Florida) received subpoenas from the New York Department of Financial Services (the NYDFS) regarding its lender-placed insurance business and related document retention practices.").

6.     In this action, Plaintiff challenges Wells Fargo's practice of purchasing force-placed hazard insurance from the Assurant Defendants pursuant to agreements that return a financial benefit to WFI or another Wells Fargo affiliate that is unrelated to any *bona fide* interest in protecting the Lender's interest in the loan, and which results in unauthorized,

unjustified and unfairly inflated costs to the borrower for force-placed hazard insurance in violation of law.

7.     As set forth in detail below, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, without limitation: (a) providing force-placed insurance according to pre-arranged agreements with the Assurant Defendants including ASIC, at a substantial and inappropriately high cost to the borrower; (b) receiving kickbacks in the form of purported fees, payments, commissions, "rebates" and/or other things of value from providers of force-placed insurance; (c) forcing borrowers to pay for unnecessary insurance; and (d) improperly exploiting the ability to manage and gain access to escrow funds in breach of fiduciary obligations to increase profits to lenders, servicers and insurance providers.

8.     Wells Fargo's unlawful actions include, *inter alia*, purchasing unconscionably high-priced insurance policies; entering into pre-arranged agreements to acquire force-placed insurance from ASIC and Assurant and/or their affiliates without any regard for competitive pricing; entering into pre-arranged agreements that yield exorbitant force-placed insurance in order to maximize their own profits to the detriment of borrowers; backdating the force-placed policies to charge for worthless retroactive coverage; and giving and/or receiving "kickbacks" in the form of purported "commissions," "rebates" and/or reinsurance premiums for the procurement of the force-placed policies with all the associated increases in the premiums for the insurance being passed on to consumers.  These actions constitute a pattern and scheme of exploitative profiteering and self-dealing against the interests of Plaintiff and the Class (defined below) and in violation of the law.

9.      Defendants ASIC and Assurant's unlawful actions include aiding and abetting Wells Fargo's breach of fiduciary duty through the promotion and participation of a scheme pursuant to which Assurant sold unconscionably high-priced, unnecessary, and duplicative force-placed insurance coverage and related services, including tracking, pursuant to pre-arranged agreements facilitated through the improper utilization of access to escrow funds in order to maximize Defendants' profits to the detriment of borrowers.

10.     Upon information and belief, Wells Fargo has entered agreements with Defendants ASIC and other affiliates and subsidiaries of Assurant, pursuant to which Wells Fargo and/or its subsidiaries or affiliates: (a) receive a portion of the premiums for each force-placed insurance policy purchased for a borrower; and/or (b) assume a portion of the force-placed insurance policies originally written by force-placed insurance providers without any real or commensurate transfer of risk.  Moreover, upon information and belief, those arrangements are exclusive. See Exhibit 8, at 4. *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 4 ("Assurant Specialty Property establishes long-term relationships with leading mortgage lenders and servicers.  The majority of our lender-placed agreements are exclusive.  Typically these agreements have terms of three to five years and allow us to integrate our systems with those of our clients.").

11.     Plaintiff asserts state/common law claims against Wells Fargo for breach of its contractual obligations, including the implied covenant of good faith and fair dealing, owed to Plaintiff and the other Class members, for engaging in unconscionable, deceptive and/or fraudulent business practices in violation of Illinois law, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*  Plaintiff also asserts breach of fiduciary duties/misappropriation of escrow funds held and managed by Wells Fargo for the

purpose of paying Escrow Items in accordance with the terms of Plaintiff's and Class members' mortgages, against Wells Fargo.

12.     Plaintiff also asserts claims under the llinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* and common law against ASIC and its parent/affiliate Assurant for its participation in the unconscionable and deceptive manipulation of force-placed insurance practices as described herein, for unjust enrichment, and for aiding and abetting Wells Fargo's breach of fiduciary duty in connection with the use, maintenance and exploitation of access to escrow accounts established under the mortgage to pay Escrow Items for the purpose of furthering the force-placed insurance scheme alleged herein and unlawfully and improperly maximizing the profits of the participants in the scheme.

13.     In the present action, Plaintiff does not challenge the rates of their force-placed hazard insurance provider as excessive.  Rather, Plaintiff challenges, among other things and as further described herein, Wells Fargo's decision, made in concert with the Assurant Defendants, to purchase force-placed hazard insurance as part of a scheme to provide a financial benefit to Wells Fargo and/or its affiliates while providing substantially less coverage to the borrowers.

14.     On information and belief, Wells Fargo has also negotiated deals with the Assurant Defendants and/or other force-placed insurance providers, pursuant to which Wells Fargo received a percentage of the cost of the premiums of each force-placed insurance policy purchased for a borrower.  This commission or kickback encourages Wells Fargo to select the most expensive force-placed insurance policy at the borrowers' expense.

15.     Thus, while Plaintiff does not challenge Wells Fargo's ability to force-place insurance policies and to charge fees/premiums for the same, Plaintiff challenges the manner in which Defendants manipulated the force-placed insurance process for their own financial gain, in

breach of Wells Fargo's contractual and fiduciary duties and in violation of statutory and common law.

16.    At issue in this case is whether Defendants have been unjustly enriched by manipulating the force-placed insurance process so as to obtain kickbacks; breached the express and/or implied terms of the mortgage contract (including the covenant of good faith and fair dealing); breached their fiduciary duties; and/or violated state statutory provisions by unreasonably, unconscionably and unlawfully exercising their contractual discretion to manipulate the force-placed insurance process so as to obtain financial benefits for themselves at Plaintiff's and Class members' expense.  In this action, Plaintiff challenges Defendants' unlawful conduct and seeks statutory and compensatory damages, punitive damages, restitution for Defendants' unjust enrichment, declaratory, injunctive and other equitable relief.

## JURISDICTION AND VENUE

17.    This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff and many members of the Class are citizens of different states than Defendants.  The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the proposed Class.

18.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

19.    Venue is proper in this District under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff's mortgage loan transaction is located in this District, Plaintiff resides in this District, Defendants regularly conduct business in this District, and/or a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

### Plaintiff

20.     Plaintiff Debra Simpkins ("Plaintiff") resides in Belleville, Illinois.  On or about April 30, 2004, Plaintiff obtained a mortgage loan in the amount of $86,541 from Gershman Investment Corporation, secured by her primary residence.  See Exhibit 9, attached hereto.

21.     This mortgage loan or the servicing rights with respect to the mortgage were subsequently sold to Wells Fargo.

22.     As required by her mortgage loan, Plaintiff maintained a hazard insurance policy from State Farm Insurance ("State Farm") to protect the dwelling as well as other structures, personal property and liability.  That policy had an annual premium of $596.00 for the period November 2005 though October 2006.  Plaintiff thereafter received notice from State Farm that her policy would not be renewed and would expire.

23.     Wells Fargo subsequently force-placed a hazard insurance policy in or around 2007 and Plaintiff has been paying those premiums ever since.

24.     Most recently, Wells Fargo, through WFI, has force-placed a hazard insurance policy issued by ASIC, effective from October 17, 2011 through October 17, 2012, with an annual premium of $1,395.00.

25.     Upon information and belief, Wells Fargo has received a commission or "kickback" from the Assurant Defendants in connection with Plaintiff's force-placed hazard insurance policy.

### Defendants

26.     Defendant Wells Fargo Bank, N.A. ("WFBNA") is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California.

WFBNA is registered to do business in the State of Illinois. Wells Fargo Home Mortgage ("WFHM") is an unincorporated division of WFBNA. WFHM handles the mortgage servicing business for Wells Fargo, including the mortgage loans and lines of credit of Illinois homeowners and homeowners across the United States. At all relevant times, WFHM's conduct was approved, authorized and/or ratified by WFBNA.

27.     Defendant Wells Fargo Insurance, Co. ("WFI") is an affiliate of WFBNA with its principal place of business in St. Louis Park, Minnesota. On information and belief, WFI receives commissions, kickbacks and/or reinsurance premiums associated with Wells Fargo's force-placed insurance scheme from the Assurant Defendants.

28.     Defendant Assurant, Inc. is a Delaware corporation and "is a provider of specialized insurance products and related services in North America and select worldwide markets." Assurant, Inc. has four operating segments, including Assurant Solutions, Assurant Specialty Property, Assurant Health, and Assurant Employee Benefits. See Exhibit 8, at 1. Assurant, Inc., together with QBE Insurance, controls about 90% of the force-placed insurance market. *See* Mary Williams Walsh, *New York Investigates Insurer Payments to Banks*, N.Y. Times (May 21, 2012) attached hereto as Exhibit 10. Assurant, Inc. offers its force-placed ("lender-placed") insurance products through the Assurant Specialty Property segment. "The largest product line within Assurant Specialty Property is homeowners insurance, consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender-placed programs." *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 4. Assurant, Inc. uses "a proprietary insurance-tracking administration system linked with the administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify

those that are uninsured" and when a lapse is confirmed "a lender-placed policy is procured by the lender." *Id.*

29.     Defendant American Security Insurance Company ("ASIC") is a Delaware corporation with its principal place of business in Atlanta, Georgia.  ASIC is a subsidiary of Assurant, Inc. that does business in Illinois and throughout the United States.  ASIC provides services to Wells Fargo "to track borrower compliance with insurance obligations and to place lender-placed insurance for Wells Fargo" pursuant to a Master Services Agreement between ASIC, another subsidiary of Assurant ("Standard Guaranty Insurance Company") and Wells Fargo).  *See* Declaration of Ronald Wilson, available at *Kunzelman v. Wells Fargo,* Docket No. 11-cv-81373 (S.D. Fla. Jan. 26, 2012) (ECF No. 26-2) attached hereto as Exhibit 11.  Plaintiff's force-placed hazard insurance policy issued by ASIC.

## FACTUAL ALLEGATIONS

30.     Wells Fargo, as is typical of mortgagees, requires borrowers to purchase and agree to maintain hazard insurance coverage on their secured property as a condition to closing. *See e.g.,* Exhibit 9, supra § 5.

31.     In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer to "force-place insurance" when the homeowner fails to maintain the insurance; the amounts disbursed for the procurement of such insurance become additional debt secured by the mortgage.  Paragraph 4 of Plaintiff's FHA mortgage loan contract contains such a provision.  *See e.g.,* Exhibit 9, supra § 5.  Thus, the failure of a borrower to maintain hazard insurance is clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

32.     The authority afforded the lender or third-party servicer; however, to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself.  Wells Fargo routinely exceeds the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property and through other conduct described herein with respect to the force-placement of insurance.

33.     Plaintiff's and Class Members' mortgage agreements do not disclose that servicers will receive commissions, kickbacks or reinsurance premiums from force-placed insurance providers for purchasing the insurance from them.  The mortgage agreements also do not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance.  Instead, the contracts misrepresent to borrowers that the cost of the force-placed insurance is necessary in order to protect the lender's interest in the secured property. *See e.g.*, Exhibit 9, supra § 5.

34.     Lender-placed or force-placed insurance policies are almost always more expensive than standard insurance coverage.  Reportedly, such policies can cost as much as ten times more than standard policies.  While the force-placed insurance policy is primarily for the benefit of the lender, the excessive cost is passed on to the borrower.  *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 10, 2010, 12:00    pm)    (http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-028474-1.html (referred to herein as "Ties to Insurers"), attached hereto as Exhibit 12.

**A.      Mortgage Loan Lenders And/Or Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements To Refer Borrowers To Certain Force-Placed Insurance Providers**

35.     Force-placed insurance programs have become a lucrative business for the loan servicers.  Commonly, the servicer selects the provider in accordance with a pre-arranged

agreement and force-places the policy in such a way as to receive an improper financial benefit. The servicer benefits by placing the policy either: (a) with an affiliate; or (b) with a third party provider who has already agreed to share revenue with the lender and/or servicer in the form of a direct commission payment and/or through "reinsurance" premiums that are ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

36.     Under the direct payment arrangement, the provider of the force-placed insurance policy pays a portion of the premium collected either directly to the servicer or to a subsidiary posing as insurance "agent" as a commission or as a "reimbursement" of the servicer's "incurred expenses" related to force-placing the insurance.     Typically, where such payments are commissions, they are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

37.     Upon information and belief, Wells Fargo's affiliate, Wells Fargo Insurance, Inc., serves in this capacity in connection with Wells Fargo's force-placed insurance scheme and with respect to Wells Fargo's arrangement with ASIC and Assurant, Inc.   Specifically, Wells Fargo collects "commissions" for the policies force-placed with ASIC and/or other Assurant affiliates via payments made to WFI.

38.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer.   In return for the subsidiary's agreement to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.   For example, Assurant, the nation's largest provider of force-placed insurance with multiple subsidiaries and affiliates, including ASIC, has acknowledged

that its force-placed insurance division "writes[s] business produced by their clients, such as mortgage lenders and servicers, financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at F-59.

39.    Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:

# Sharing in the Profits
How servicers make money arranging force-placed coverage

| Commissions | Reinsurance |
|---|---|
| To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer | To replace lapsed coverage, servicer buys policy on home from insurer |
| Servicer advances premiums to insurer | Servicer advances premiums to insurer |
| Insurer pays portion of premium back to subsidiary as a commission | Subsidiary of servicer reinsures part of the policy, gets a cut of premiums |
| Servicer bills borrower for the policy | If necessary, subsidiary buys letter of credit from another party |
| | Servicer bills borrower for the policy |
| If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale | If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale |





40.    J. Robert Hunter of the Consumer Federation described these practices in his testimony before the New York Financial Services Department:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using

> "fronting" primary insurers to direct the coverage to lender-
> affiliated captive reinsurers. Lenders often receive free or below
> cost service from affiliated service providers.

*See* Hunter NYDFS Testimony.

41.     Birny Birnbaum of the Center for Economic Justice, another experienced and

noted expert in the area of force-placed insurance, testified:

> Servicers have financial incentives to force-place the insurance
> because the premiums include commissions and other
> considerations for the servicer. With some servicers, the insurance
> is reinsured through captive reinsurer of the servicer, resulting in
> additional revenue to the servicer from the force-placement
> coverage.

*See* Birnbaum NYDFS Testimony.

42.     Borrowers have no say or input into the carrier or terms of the force-placed

insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the

policy, are determined by the servicer and the insurer, rather than negotiated between the

borrower and the insurer.  *Id.*; *see also* Hunter NYDFS Testimony.

43.     For their part, servicers have no incentive to comparison shop for the best rate.

Rather, servicers are financially motivated to refer borrowers to the provider that will provide the

best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

As the servicer's "commission" (*i.e.*, kickback) and/or reinsurance premium is usually related to

the size of the policy, the servicer actually has an incentive to purchase the *highest* price

insurance, an interest diametrically opposed to that of the borrower.  *See, e.g.*, Birnbaum NYDFS

Testimony; Hunter NYDFS Testimony.

44.     Commonly, a mortgage loan servicer enters into an agreement with an insurance

provider, pursuant to which it refers borrowers exclusively to the provider for force-placed

insurance.  For example, in its public filings, Assurant, the nation's largest provider of force-

placed insurance policies and the parent of ASIC, with whom Defendant force-places insurance, states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant, Inc. Annual Report, Form 10-K, at 5, filed on February 23, 2011 ("The majority of our lender-placed agreements are exclusive.").

45.    Upon information and belief, Wells Fargo is party to an agreement with Assurant pursuant to which Wells Fargo receives payments for the referral of business through one or more of the arrangements described above, including through commissions paid to WFI.

46.    Force-placed insurance policies are not underwritten on an individual policy basis. Rather, servicers' contracts with force-placed insurance providers such as Assurant, Inc. or its subsidiaries require, or at least permit, the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

47.    As J. Robert Hunter in his recent testimony before the New York Financial Services Department testified, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYFSD Testimony.

48.    Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider. The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately

charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers, *supra*.

49.    John Frobose, President of ASIC, confirmed this practice, acknowledging that, "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been cancelled or is about to expire." *See* Frobose NYDFS Testimony.

50.    While servicers profit greatly from their business of force-placing insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business bring servicers hundreds of millions of dollars every year." *See* Ties to Insurers, *supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

51.    "The incentives and potential for abuse in the administration of LPI [lender placed insurance] are great.  Consumers do not request the insurance, but are forced to pay for it.  The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services, attached hereto as Exhibit 13.

52.    In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%.

Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.  The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance."  *Id.*

53.    While servicers such as Wells Fargo profit greatly from the business of force-placed insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance. However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Ties to Insurers, *supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

54.    Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers, *supra*.

55.    Direct "kickbacks" are also part of the process.  "The insurance company that issued the [Homeowner's] new forced place insurance told ABC News that it generally pays Chase a 15 percent commission on such policies."  Chris Cuomo, *Insurance Frustration: Family on Brink of Losing Home Get Mortgage Relief Following ABC News Report,* ABC News (Mar.

10, 2010), http://abcnews.go.com/TheLaw/abc-world-news-homeowners-angry-expensive-fixed-place-insurance/story?id=9919670, attached hereto as Exhibit 14.

56.     Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *See id.*

57.     As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." Loss ratios have been historically low. *See* Birnbaum NYDFS Testimony.

**B.     Defendants Charge Borrowers For Redundant Or Otherwise Unnecessary Insurance**

58.     Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative or in amounts greater than required by law or their mortgage agreements.

59.     Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants commonly require borrowers to pay for unnecessary insurance coverage.  Such examples include, without limitation: (a) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for worthless retroactive coverage for periods of time during which the lender or servicer knew or easily could have known that no loss occurred; and (b) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property

was covered for such time pursuant to either a "standard mortgage clause,"[1] or, upon information and belief, Lender's Loss Payable Endorsement in the previous policy, either of which continues the lender's coverage following a lapse for non-payment of premium.

60.   Simply put, force-placed hazard insurance policies should not be backdated.  The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature."  Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper and unlawful.  *See, e.g.*, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed").

61.   Moreover, the overwhelming majority of mortgages, including Paragraph 4 of Plaintiff's mortgage, contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause,"[2] or, further, upon information and belief, a "Lender's Loss Payable Endorsement," pursuant to which coverage for the lender continues even after the insured has failed to pay premiums.  Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful, unfair and unconscionable because borrowers are charged for needless and duplicative insurance coverage offered at no risk to the insurer.

---

[1] *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 31-42 (1997).

[2] *See also* Fannie Mae standard contracts for all fifty states, available at https://www.efanniemae.com/sf/formsdocs/documents/secinstruments/.

C.    **Government Response**

62.    Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies. *See Under Interrogation, supra*; Gretchen Morgenson, *Hazard Insurance With Its Own Perils, supra*; *see also* Louise Story, *Big Banks Face Inquiry Over Home Insurance*, New York Times (Jan. 10, 2012), attached hereto as Exhibit 15.

63.    Thus state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into a historic joint state-federal settlement agreement with the country's five largest loan servicers, including Wells Fargo ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement).Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance.  Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.; see*

*also Consent Judgment, United States of America v. Bank of America Corp.,* Civ. No. 1:12-cv-00361-RMC (D.D.C Apr. 14, 2012) (ECF No. 14 Section VII).

64.     Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry—which also had a relatively low level of losses—as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.,* Broderick Perkins, *Title Insurance Industry in Hot Water with Regulators Again*, San Jose Business Journal (May 22, 2005), available at http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html, attached hereto as Exhibit 16.

65.     Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "This reinsurance scheme appears to be nothing more than a form of commercial bribery."   As a result, a number of providers have abandoned such arrangements altogether.

66.     Fannie Mae has changed its polices so as to curb bank and servicers' improper practices.   It issued a Service Guide Announcement on March 14, 2012, "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04 at 1.   The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

■ any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id.* at 4.

67.    The New York State Department of Financial Services recent hearings on force-placed insurance practices have resulted in government action and findings that borrowers were overcharged for force-placed insurance.  On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance."  Available at http://www.governor.ny.gov/press/06122012DFS, attached hereto as Exhibit 17.  It stated:

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing.  Also, the DFS discovered that the force-placed insurance market lacks the sort of completion that would keep premiums down.  In New York, two companies have 90% of the market. In addition, the hearings made clear that force-placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

68.    The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is also unnecessary.  For example, during 2009, Assurant collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance.  Notably, this insurer paid out only 36% of this amount in claims, though in the company's other lines of business a 70% claims-to-premiums ratio is the norm.  Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product.  *Id.*  Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for lender-placed hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available

homeowners policies. *See* Birnbaum NYDFS Testimony at 9. When confined to the period from 2007-2011, the disparity between lender-placed hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 points. *Id.*

**D.     Defendants' Policies And Practices Artificially Inflate The Premiums Charged For Force-Placed Insurance**

69.     As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, *supra*. These costs are ultimately paid by the borrowers.

70.     Notably, Assurant's public filings indicate that approximately 40% of its force-placed insurance division's revenue is allocated to pay for "general expenses." This category includes commissions/referral fees paid to servicers and their affiliated entities. In other lines of insurance, overhead and expenses are usually a much smaller fraction of policyholder claims. *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 61. Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher, implying paydays for servicers amounting to hundreds of millions of dollars per year. *See, e.g.*, Birnbaum NYDFS Testimony.

71.     Moreover, premiums are inflated because they include tracking servicing costs and expenses unrelated to and on top of the cost of the force-placed insurance itself, including loan tracking and servicing activities. *Id.*

72.     The premiums are also inflated by the payment of kickbacks to servicer-affiliated insurance producers such as Defendant WFI as these entities do not perform the activities typically associated with insurance producers and brokers, which actually justify a commission:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policy holder's needs while seeking the most competitive prices for the product. Such activities simply do not exist in [FPI] because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals—and such activity is a rare event for most servicers.

*Id.*

73.    Defendants' practices of unlawfully profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks – to the detriment of consumers.

74.    Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, *supra.*

75.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher – implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Classes for the maximum time period

allowable by law:

> All persons who have or had a residential mortgage loan or line of
> credit owned, originated or serviced by Wells Fargo or Wells
> Fargo Home Mortgage secured by property located in the United
> States and, in connection therewith, were required to pay for
> "force-placed" hazard insurance on the secured property (the
> "Nationwide Class"); and
>
> All persons who have or had a residential mortgage loan or line of
> credit owned, originated or serviced by Wells Fargo or Wells
> Fargo Home Mortgage secured by property located in the State of
> Illinois and, in connection therewith, were required to pay for
> "force-placed" hazard insurance on the secured property (the
> "Illinois Class") (collectively, the "Classes").

77.     The Classes exclude Defendants and any entity in which Defendants have a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

78.     The Classes are each so numerous that joinder of all members is impracticable.

79.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

80.     Plaintiff's claims are typical of the claims of each of the Classes.

81.     There are questions of law and fact common to the Classes, the answers to which

will advance the resolution of the claims of all of the Classes' members and that include, without

limitation:

(a)     Whether Defendants maintained a policy of referring force-placed

insurance business to insurers pursuant to pre-arranged agreements;

(b)     Whether Defendants or their subsidiaries or affiliates received

commissions or any other payments or things of value from force-placed insurance providers;

(c)     Whether Defendants or their subsidiaries or affiliates participated in arrangements that involved kickbacks;

(d)     Whether Defendants or their subsidiaries or affiliates received reinsurance premium payments from force-placed insurance providers;

(e)     Whether Defendants received financial benefits from the force-placed insurance providers in the form of insurance monitoring, tracking and processing services;

(f)     Whether Defendants' force-placed insurance policies were provided by an affiliated entity;

(g)     Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

(h)     Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

(i)     Whether Defendants improperly backdated forced-placed insurance policies;

(j)     Whether Defendants required unnecessary or duplicative force-placed insurance;

(k)     Whether Defendants' conduct constituted an unconscionable business practice;

(l)     Whether Defendants breached the implied covenant of good faith and fair dealing in Plaintiff's and members of the Classes' mortgages or loan contracts;

(m)     Whether Defendants breached the terms of Plaintiff's and members of the Classes' mortgages or loan contracts;

(n)     Whether Defendants have been unjustly enriched;

(o)     Whether Defendants' business practices alleged herein are deceptive acts or practices;

(p)     Whether Wells Fargo breached its fiduciary duty to Plaintiff and members of the Classes;

(q)     Whether Defendants Assurant Inc. and ASIC induced and/or participated in Wells Fargo's breach of fiduciary duties;

(r)     Whether Defendants are liable to Plaintiff and the Classes for damages and, if so, the measure of such damages; and

(s)     Whether Plaintiff and the Classes are entitled to declaratory, injunctive, and other equitable relief.

82.     These and other questions of law and fact are common to the Classes and predominate over any questions affecting only individual members of the Classes.

83.     Plaintiff will fairly and adequately represent and protect the interests of the Classes.  Plaintiff has no claims antagonistic to those of the Classes.  Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of this litigation.  Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Classes.

84.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of

inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant.

85.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

86.     Class action status is also warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

87.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT ONE**
**BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
**(AGAINST THE WELLS FARGO DEFENDANTS)**

88.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

89.     Wells Fargo has originated and/or serviced loans evidenced by substantially similar standard form notes, form mortgage contracts and form deeds of trust.

90.     To the extent that the mortgage contracts of Plaintiff and the Classes permitted Wells Fargo to unilaterally "force-place" insurance, Wells Fargo was contractually permitted to do so in a reasonable manner, *i.e.*, only to the extent reasonably necessary to protect the mortgagee's interest in the secured property.

91.     Nonetheless, Wells Fargo has imposed or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the property. Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement or standard mortgage clause that already protects the lender's interest in the property.

92.     By force-placing insurance in this manner, Wells Fargo has breached their contractual obligations owed to Plaintiff and the Classes.

93.     As a direct, proximate, and legal result of the aforementioned breach of the express terms of the mortgage contracts, Plaintiff and the Classes have suffered damages and are entitled to the relief sought herein.

94.     In addition, every contract contains an implied covenant of good faith and fair dealing.

95.     The mortgage contracts of Plaintiff and the Classes each contained an implied covenant of good faith and fair dealing, pursuant to which Wells Fargo was bound to exercise the

discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiff and the Classes in that regard.

96.     To the extent that the mortgage contracts of Plaintiff and the Classes permitted Wells Fargo to unilaterally "force-place" insurance, Wells Fargo was obligated not to exercise its discretion by acting in bad faith (for its own financial gain for the purposes of maximizing profits at borrowers' expense).

97.     Wells Fargo breached their duties of good faith and fair dealing in at least the following respects, among others:

a.     Failing to make any effort to maintain borrowers' existing insurance policies and, instead – for the sole purpose of maximizing its own profit – forcing borrowers to pay for insurance policies from providers of Wells Fargo's choice.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

b.     Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both:  (i) the actual costs of protecting the mortgagee's interest in the property; and (ii) the cost of the kickbacks/reinsurance premiums Wells Fargo accepted from the force-placed insurance provider;

c.     Failing to seek competitive bids on the open market or otherwise making good faith efforts to reasonably exercise their discretion and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Wells Fargo;

d.      Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and the Classes and misrepresenting the reason for the cost of the policies;

e.      Collecting a percentage of the force-placed premiums charged to Plaintiffs and the Classes and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

f.      Backdating force-placed insurance policies to cover time periods which already passed and for which there was no risk of loss;

g.      Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time or the lender's coverage under a Lender's Loss Payable Endorsement or "standard mortgage clause";

h.      Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or "standard mortgage clause"; and

i.      Failing to provide borrowers with any meaningful opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants have an affiliate relationship or commission arrangement.

98.      As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the other members of the Classes have suffered damages in an amount to be proven at trial.

**COUNT TWO**
**UNJUST ENRICHMENT/DISGORGEMENT**
**(AGAINST ALL DEFENDANTS)**

99.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

100.   Plaintiff and the Classes have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums paid by Plaintiff and the Classes.

101.   These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and members of the Classes.

102.   As a result of Defendants' unjust enrichment, Plaintiff and the Classes have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

103.   Plaintiff and the Classes also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

104.   Defendants received from Plaintiff and members of Classes a benefit in the form of overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overreaching and self-dealing.

105.   Defendants entered into an agreement whereby ASIC would provide force-placed insurance policies to Plaintiff and the Classes that were paid for at prices that were far higher than the market rates for similar policies.  Defendants knew that the charges for these policies were excessive and not the result of good faith practices.

106.   ASIC paid significant monies in illegal kickbacks, commissions, and referral fees directly to Wells Fargo in order to be able to exclusively provide force-placed insurance policies at unreasonable rates.

107.     As a result, Plaintiff and the Classes have conferred a benefit on Defendants, and Defendants have knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

108.     Defendants will be unjustly enriched if they are allowed to retain the benefit, and each member of the Classes is entitled to an amount equal to the amount they enriched Defendants and for which Defendants have been unjustly enriched.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION OF FUNDS HELD IN TRUST**
**(AGAINST THE WELLS FARGO DEFENDANTS)**

109.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

110.     Pursuant to Plaintiff's Mortgage (and those of the Classes), Wells Fargo holds and/or controls funds in escrow; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes, assessments, insurance premiums and other items set forth in borrowers' mortgages, and is obligated under the Mortgage to return any excess funds in accordance with the terms of the Mortgage.

111.     Since the time that Wells Fargo began servicing Plaintiff's Mortgage, Wells Fargo has required payment of and accepted monies from Plaintiff for Escrow Items identified in Plaintiff's Mortgage on a monthly basis and held them in escrow.

112.     Wells Fargo was obliged to hold, manage and control these escrow funds in trust, and owed Plaintiff and members of the Classes the highest fiduciary duty with respect to the handling of such funds.

113.     Wells Fargo breached its fiduciary duty to Plaintiff and the members of the Classes by, *inter alia*:  unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for

Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiff and the members of the Classes; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for periods for purposes of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized and duplicative hazard insurance resulting in additional costs and injury to Plaintiffs and members of the Classes.

114.   These actions were undertaken by Wells Fargo in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiff or members of the Classes.

115.   As a direct result of Wells Fargo's actions and subversion of Plaintiff's interest to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiff and the Classes have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

116.   Plaintiff and the Classes are entitled to all damages resulting from Wells Fargo's breach of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiff and the Classes are entitled to punitive damages because Wells Fargo acted in bad faith in deliberate and/or reckless disregard of their rights and Wells Fargo's obligation to hold their escrow funds in trust.

## COUNT FOUR
## AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### (AGAINST DEFENDANTS ASSURANT, INC. AND ASIC)

117.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

35

118.   Wells Fargo breached its fiduciary duties to Plaintiff and the Classes as set forth herein, including specifically as set forth in Count Three.

119.   Defendants Assurant, Inc. and ASIC actively induced and/or participated in Wells Fargo's breach of fiduciary duties through the conduct described herein, including, but not limited to, offering Wells Fargo the opportunity to reap additional profits through a scheme to force-place borrowers serviced by Wells Fargo in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by ASIC and other Assurant Inc. subsidiaries, in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to Wells Fargo.

120.   Defendants Assurant, Inc. and ASIC actively induced and/or participated in Wells Fargo's breach of fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiff and members of the Classes in unnecessary, duplicative and exorbitantly hazard insurance and facilitated the billing and payment for such insurance.

121.   As a result of the breach of fiduciary duties to Plaintiff and members of the Classes by Wells Fargo that Assurant, Inc. and ASIC induced and/or participated in as described herein, Plaintiff and members of the Classes have suffered damages in an amount to be proven at trial, including, without limitation, in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

122.   Plaintiff and the Classes are entitled to all damages resulting from Wells Fargo's breach of their fiduciary obligations and misappropriation of escrow funds.   Defendants

Assurant, Inc. and ASIC are liable for these damages by virtue of their aiding and abetting Wells Fargo's conduct.

## COUNT FIVE
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *et seq.*
## (AGAINST ALL DEFENDANTS ON BEHALF OF THE ILLINOIS CLASS)

123.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

124.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* provides, in pertinent part: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damage thereby...." *See* 815 ILCS 505/2.

125.   Defendants' business practices alleged herein are deceptive acts or practices and, thus, constitute multiple, separate and independent violations of 815 ILCS 505/1, *et seq.* These deceptive acts and practice include, without limitation:

(a)   Failing to make any effort to maintain borrowers' existing insurance policies and, instead, for the sole purpose of maximizing their own financial gain, purchasing and charging borrowers for force-placed insurance policies from providers of Defendants' choice, such as ASIC. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)     Choosing a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)     Selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d)     Assessing excessive, unreasonable and unnecessary insurance policy premiums against Plaintiff and the Illinois Class and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)     Misrepresenting in force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement or standard mortgage clause;

(g)     Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement or standard mortgage clause;

(h)     Failing to provide borrowers with any opportunity to opt out of having their force-placed insurance policies provided by an insurer with whom Defendant had a kickback arrangement;

(i)     Misrepresenting that the charges imposed for force-placed insurance were to protect the borrowers' and Defendants' "mutual interests in the property" and that any

portions of the premiums returned to Defendants were for expense incurred in connection with forced-placing insurance; and

(j)     Engaging in other unfair or unlawful conduct as described in this Complaint.

126.    Defendants engaged in these deceptive acts or practices in the conduct of business, trade or commerce in the State of Illinois.

127.    Defendants' communications with Plaintiff and the Illinois Class members in which they notify mortgagees that force-placed insurance has been or will be purchased on the mortgaged property and communications or documents which purport to describe or proscribe Defendants' practices of force-placed insurance are directed to consumers as that term is defined under Illinois Law.

128.    Defendants' deceptive acts or practices alleged herein are likely to mislead reasonable consumers acting reasonably under the circumstances, including Plaintiff and members of the Illinois Class.

129.    Defendants' deceptive acts or practices alleged herein constitute consumer-oriented conduct in that Defendants' deceptive acts or practices were directed to, and affected, consumers of mortgage and home insurance products, including Plaintiff and the Illinois Class members.

130.    Defendants' deceptive acts or practices alleged herein have a broad, adverse impact on consumers, including Plaintiff and the Illinois Class members.

131.    Defendants' deceptive acts or practices alleged herein are part of a pattern of conduct by Defendants to defraud consumers, are ongoing and are likely to continue to harm the public and frustrate the public interest in commercially reasonable and non-deceptive insurance

and mortgage servicing practices between Defendant and the residents of Illinois whose mortgages they service.

132.   Defendants' deceptive acts or practices alleged herein have been furthered, in part, through a pattern of standard written communications disseminated broadly by or on behalf of Defendants to thousands of Illinois residents whose mortgages they service.

133.   Defendants' deceptive acts or practices alleged herein are material in that they relate to matters that would reasonably be expected to be important to a reasonable consumer in making his or her decision whether to do business with Defendant.

134.   Plaintiff and the Illinois Class members were injured by and as a direct or proximate result of Defendants' deceptive acts or practices set forth in this Complaint. Defendants' deceptive acts or practices caused injury and damages to Plaintiff and the Illinois Class members in an amount to be proven at trial, including paying excessive and commercially unreasonable premiums for homeowners insurance.

135.   Plaintiff and the Illinois Class members seek to recover their actual damages, injunctive relief, costs and reasonable attorneys' fees, pursuant to 815 ILCS 505/1, *et seq.*

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Classes and award the following relief:

A.   That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Classes and Plaintiff's counsel as counsel for the Classes;

B.   That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C   Compensatory, consequential, and general damages in an amount to be determined at trial;

D.      Actual damages, injunctive relief, costs and reasonable attorneys' fees, pursuant to 815 ILCS 505/1, *et seq.*;

E.      Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Classes;

F.      A judgment declaring that Defendants must cease the activities described herein, and provide members of the Classes with adequate remedies, including, without limitation, refunds or credits of all unfair, unlawful or otherwise improper force-placed insurance premiums, and provide for adequate policies and procedures to ensure that Defendants' unlawful conduct does not continue, including, without limitation, that Defendants: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) are prohibited from force-placing excessive hazard insurance; (c) are prohibited from purchasing force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) are prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or placement of force-placed insurance; (e) must make reasonable efforts to continue or reestablish the borrower's existing insurance policy if there is a lapse in payment; (f) must purchase any force-placed insurance for a commercially reasonable price; and (g) are prohibited from backdating force-placed insurance policies absent evidence of damage to the property or claims arising out of the property during any lapse periods;

G.      Costs and disbursements of the action;

H.      Pre- and post-judgment interest;

I.      Reasonable attorneys' fees; and

41

J.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  July 3, 2012                    Respectfully submitted,

                                        HOLLAND, GROVES, SCHNELLER
                                           & STOLZE, LLC.


                                        /s/ Eric D. Holland
                                        Eric D. Holland, ARDC No. 6207110
                                        Gerard B. Schneller, ARDC No. 6205863
                                        HOLLAND, GROVES, SCHNELLER
                                           & STOLZE, LLC
                                        300 N Tucker, Suite 801
                                        St. Louis, Missouri 63101
                                        Telephone: 314.241.8111
                                        Facsimile: 314.241.5554
                                        Email: eholland@allfela.com
                                               gschneller@allfela.com

                                        David Cates #06289198
                                        The Cates Law Firm, L.L.C.
                                        216 West Pointe Drive, Suite A
                                        Swansea, IL  62226
                                        Telephone: 618-277-3644
                                        Facsimile: 618-277-7882
                                        E-mail:dcates@cateslaw.com

                                        Charles Schaffer
                                        Levin Fishbein Sedran & Berman
                                        510 Walnut Street, Suite 500
                                        Philadelphia, PA 19106-3697
                                        Telephone: 215-592-1500
                                        Facsimile: 215-592-4663
                                        Email: cschaffer@lfsblaw.com

Shanon J. Carson
Patrick Madden
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-4656
Facsimile: 215-875-4604
Email:  scarson@bm.net
           pmadden@bm.net

*Attorneys for Plaintiff*