NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

TESTIMONY OF JOHN FROBOSE

PRESIDENT OF AMERICAN SECURITY INSURANCE COMPANY

John Frobose, President of American Security Insurance Company ("ASIC"), submits this written testimony to the Department of Financial Services, in response to the April 12, 2012 Notice of Public Hearings, issued pursuant to N.Y. Financial Services Law §§ 305 and 306 and the Department's request for written testimony pursuant to N.Y. Insurance Law § 308.

I.  Lender-Placed Insurance Fulfills an Important Need

Homeownership in America is possible because of mortgage lending. A necessary foundation for residential mortgage lending is maintaining insurance on the underlying collateral for the loan: the home. Mortgage lenders have always required homeowners to carry insurance on the mortgaged property. Under the terms of virtually all mortgage loan agreements, homeowners are required to carry such insurance coverage.

All originators and purchasers of home mortgages, including Fannie Mae and Freddie Mac, require mortgage servicers to ensure that insurance coverage "is in place at all times." To meet this requirement, mortgage servicers engage insurance companies, such as ASIC, to provide insurance coverage on properties when no other coverage is in place because no standard insurer will provide coverage or the homeowner has failed to maintain coverage. The most critical feature of this type of insurance is that it ensures continuous coverage as of the date a standard policy lapses or is canceled. This insurance is referred to as Lender-Placed Insurance ("LPI"). Without the safety net of LPI, mortgage loan interest rates would rise and mortgage lenders would make fewer loans.



PLAINTIFF'S EXHIBIT 5

ASIC LPI covers homeowners and lenders. To protect both, LPI policy limits historically have been set at the coverage amount of the previous policy, which is the best estimate of the replacement cost of the home. As a result, homeowners have the means to repair or rebuild in the event of a covered loss (for example, damage from fire, wind or hail). LPI policies are automatically effective from the date the prior standard coverage lapses or is canceled, providing homeowners with continuous coverage. So, for example, if the home is damaged or destroyed by a covered peril immediately after the standard policy lapses or is canceled, the LPI insurance carrier pays the loss. This coverage also assures the lender that damage or destruction of the property from a covered peril will not wipe out the security for the loan.

Historically, LPI has helped many homeowners who did not have standard insurance coverage to rebuild their homes in the face of catastrophe. For instance, ASIC incurred $94 million in losses covering more than 9,400 homeowners for catastrophes occurring in 2011. Approximately $38 million of this amount, including $20 million in flood claims, arose from Hurricane Irene, which soaked the Eastern Seaboard and devastated communities in 34 New York counties.

Many claims are paid on properties in areas in which standard insurers have reduced their coastal and other high risk exposure. Following the destructive hurricane seasons of 2004 and 2005, standard insurers continued a trend of withdrawing from certain high-risk areas, leaving homeowners with fewer options in the standard insurance market. New York is not immune from this market dislocation. In recent years some of the largest standard insurers publicly announced their intention not to renew over 50,000 policies covering homes in

2

New York City and on Long Island. In contrast with these standard carriers, ASIC is required to provide coverage in all states and in all areas, regardless of the risks.

## II. LPI – The Insurance of Last Resort, Rarely Placed

Lender-Placed Insurance is not "forced" on anyone. ASIC has developed thorough processes to ensure that homeowners have ample opportunity to avoid LPI whenever other coverage is available to them and they choose to buy it. LPI is a safety net, and ASIC dedicates substantial resources to *avoid* placing coverage where standard coverage may be obtained or is already in force. And for good reason: ASIC has every financial incentive to avoid placing LPI that is not needed. When ASIC issues a policy on a home that is covered by standard insurance, it incurs all of the costs of placing and removing the policy but retains none of the premium. Upon receipt of proper documentation, every single policy placed on a home already covered by standard insurance is canceled, and the premium is refunded, at ASIC's expense.

Under its agreements with mortgage servicers, ASIC serves as the contact for all matters related to the homeowner's insurance coverage. Servicers instruct insurance carriers and agents to route all correspondence regarding insurance coverage, such as renewals, expirations, and cancellations, directly to ASIC. Each year, ASIC receives more than 83 million insurance notices and other documents from homeowners' insurers and their agents. ASIC also fields six million phone calls annually from homeowners, their insurers and agents from all over the country regarding homeowners' insurance coverage.

### A. Avoiding LPI Placement

ASIC uses sophisticated technology to process the communications it receives regarding the status of insurance on the properties securing loans in its servicer clients' portfolios. These communications are processed through a proprietary system that extracts data

3

and uses it to update the servicers' systems, apprising the servicers on a daily basis of the insurance coverage on millions of homes and businesses nationwide.

ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been canceled or is about to expire. If ASIC then confirms that it has not received proof of continuing coverage, it undertakes an extensive "open items" process. It is at this point that ASIC attempts to obtain renewal information or other evidence of valid insurance coverage. Starting about 15 days prior to the expected coverage lapse, ASIC initiates multiple calls and other communications with homeowners' insurers, their agents, and borrowers themselves to find proof of insurance coverage. Through this "open items" process, ASIC avoids unnecessarily placing homeowners into the next phase of the process, called the "letter cycle." ASIC does not take into account loan characteristics such as delinquency to identify potential lapses in coverage, and delinquency status does not affect the rates that ASIC charges on individual policies under its currently filed New York products.

If – and only if – proof of insurance coverage has not been received after the "open items" process is completed, ASIC begins the "letter cycle" process, which typically includes the following steps:

- <u>At the date of expiration of the existing standard policy</u>: ASIC sends a letter to the homeowner, informing him or her that the servicer does not yet have proof of coverage, as required, and reminding the homeowner to provide the proof of coverage. This letter also explains several ways for the homeowner to provide such proof to ASIC.

- <u>30 days after expiration of the existing policy</u>: ASIC sends a second letter informing the homeowner that the mortgage lender still has not received proof of coverage and that a policy will be purchased if ASIC does not receive a response within a stated period, typically 24 to 30 days. This letter states that LPI coverage *will be more expensive* than the homeowner's prior standard coverage and will not cover liability or contents, as a standard policy generally does, and it encloses a binder that sets forth the annual premium to be charged in the event that an LPI

4

policy is issued. This letter again explains several ways for the homeowner to provide proof of coverage to ASIC.

- <u>60 days after expiration</u>: The servicer places the ASIC LPI policy and sends the homeowner a complete policy package.[1] This package includes a letter that again encourages the homeowner to obtain standard coverage and explains that if the homeowner does so, the LPI policy *will be canceled and the homeowner will be charged only for the period when no other coverage was in place.*

And the system works. Historically, of more than 28 million home loans nationwide for which ASIC tracks insurance coverage, it identifies about 13% annually as being at risk of a potential lapse in coverage, triggering the "open items" process. After the open items process, about 9% of loans enter the "letter cycle." For about 3% of loans tracked, borrowers receive the second letter enclosing the binder, and LPI is placed for about 2% of such loans. Thus, as a result of ASIC's processes, standard coverage is maintained on the vast majority of properties with policies at risk of lapse or cancellation, and LPI is placed only on a small fraction.

Even when a homeowner stops making mortgage payments, LPI is not always placed. For home loans for which the borrower has established an escrow account to cover insurance and taxes, as is most common, the servicer will advance the necessary funds to pay the premium to the standard insurer, so as long as the policy remains valid and an invoice for renewal can be obtained. If such a homeowner does not intentionally cancel the standard policy and the standard carrier does not cancel or non-renew it, it should remain in effect throughout the delinquency period. It is impossible for the servicer to secure a new standard policy for the homeowner, because that would require knowledge of the underwriting data to rate the policy, homeowner involvement, and a signed application.

---

[1] Although premiums may not be charged until the end of the letter cycle, the policy is effective from the date of expiration of the prior policy, providing the homeowner with continuous coverage. So, if a homeowner suffers a covered loss during this period, ASIC pays the appropriate amount to satisfy the claim so that the home can be repaired or rebuilt or the loan can be repaid.

### B. Removal of LPI

In its communications with homeowners, ASIC clearly explains that, once an LPI policy is placed, the homeowner can cancel it at any time by providing proof of other coverage or simply the name and telephone number of the current agent or carrier, whom ASIC then contacts directly to verify coverage. If there is a gap in coverage, the homeowner is charged LPI premium just for the period when the LPI was the only policy in effect. If ASIC receives proof that there was no gap in coverage, it cancels the LPI policy and refunds all LPI premiums paid.

## III. The Cost of LPI

ASIC provides coverage without regard to risk because that is the purpose of LPI: to ensure continuous insurance coverage on *all* mortgaged properties. Unlike standard insurers, which evaluate the risks associated with insuring individual properties, ASIC is required to provide coverage for all exposed properties in the servicer's portfolio. ASIC provides this coverage without inspection or underwriting of the risks associated with any insured home. As a result, ASIC insures a broader range of risks than do standard insurers, including homes in the most catastrophe-prone areas and those that are vacant, unoccupied, or have other negative underwriting factors. Thus, ASIC and other LPI insurers face greater risks than standard insurers and price for that volatility. For this reason, LPI is necessarily more expensive than standard hazard insurance.

### A. Rates

The New York Department of Insurance approved the rates ASIC charges for each of its New York LPI products. The base rate filings for ASIC's LPI programs in New York employ standard actuarial ratemaking methodologies. For programs with historical loss experience, ASIC uses the loss ratio method of actuarial ratemaking. That method measures historical loss experience against an expected loss ratio, to produce an indicated rate level change

from the prior approved rates. In the case of a new program being filed for the first time with the Department, rates from other products providing similar coverage are often used as a starting point, and then adjusted appropriately.

The most recent base rate filing for ASIC's Residential Mortgage Service Program, which is the insurance product through which ASIC provides hazard insurance and is ASIC's largest product by volume, employed the loss ratio method and was based on approximately four years of premium and loss experience. The Department's approval of the original base rate filing recognized that the higher risks associated with properties on which LPI is placed, such as vacancy, are a proper basis for setting LPI rates.

The original base rate filing for ASIC's Residential and Commercial Flood Program was based on an analysis of the Federal Emergency Management Agency's (FEMA) National Flood Insurance Program insurance product, performed by an external actuarial consulting firm. Hazard policies generally exclude flood coverage, which is legally required for homes in a FEMA-designated flood zone; this ASIC product fills the gap when no other flood coverage is in effect on such homes (after the homeowner has received the letters mentioned above, but has not renewed or obtained other flood insurance). The base rate filing for ASIC's MSP Residential Windstorm Policy Program, was supported with a New York adjusted wind exclusion credit calculated by the Insurance Services Office, Inc. (ISO), a provider of insurance rating services and standard policy forms.

B.   **Loss Ratios**

ASIC publicly reports its premiums and losses, from which the loss ratio is derived, in its statutory annual statement and the associated supplemental exhibits. The New York Insurance Department (now the Insurance Division of the Department of Financial

Services) receives a copy of this filing annually. ASIC's annual statutory filings show premiums and losses by statutory line of business and by state.

Actual loss ratios may vary from expected loss ratios for several reasons. In property insurance, a principal reason for the variance is catastrophe experience. ASIC may experience loss ratios lower than expected in non-catastrophe years, offset by loss ratios higher than expected in catastrophe years. The expected loss ratio reflects a long-term average view of the expected results for a product line.

As economic conditions affecting the housing sector have changed, the LPI market has also changed. An important factor underlying this change has been an unanticipated and significant increase in the volume of LPI on properties for which homeowners have stopped making mortgage payments. Homeowners who do not make payments for principal, interest, and taxes may also fail to maintain insurance coverage on their properties, triggering the placement of LPI. As a result, the number of LPI policies placed has increased along with ASIC's collection of premium.

As the foreclosure process has lengthened in recent years, so, too, has the period of time during which LPI policies have remained in force. Historically, serious loan delinquencies were resolved by foreclosure within a relatively predictable period of time after the first payment default. At foreclosure completion, the standard homeowners policy or LPI policy typically is canceled. However, delays and moratoriums in the foreclosure process – which have allowed some borrowers to remain in their homes when they are no longer making mortgage payments – have lengthened the period in which LPI remains in force, increasing the premiums ASIC has collected.

Some of the increase in premium has also been driven by the fact that more high-value homes are entering the LPI process. The average insured amount on homes with seriously delinquent loans is much higher than historical norms, resulting in a higher average premium per policy.

As premiums have increased, losses have not increased at the same pace. Generally speaking, losses lag premium; losses may be reported months or even years after the policy premium has been fully earned. Another reason losses have not kept pace with premium is that catastrophe losses in New York have been minimal over the period, save for the extreme flooding which took place after Hurricane Irene and that resulted in a substantial number of claims under ASIC's flood program. The lack of hurricane basin activity affecting the United States since the active 2004 and 2005 seasons has led to lower than average loss ratios across the entire homeowners sector of the insurance market in recent years, as A.M. Best has reported. On the basis of recent catastrophe modeling, ASIC estimates that, if New York took a direct hit from a Category 3 Hurricane – such as Irene had been for a period of time – ASIC's expected New York losses would be approximately 20 to 40 times those it incurred as a result of Irene.

A third reason losses are significantly lagging premiums is that delays in the foreclosure process also result in delays in reporting losses. Many properties with seriously delinquent loans are at greater risk of loss, either because they are vacant or because the occupants have little incentive to maintain the property. The realization of those losses is often delayed as fewer claims are filed on such properties before foreclosure. Because it does not underwrite individual policies or inspect homes for vacancy or condition, ASIC faces significant risks, which standard insurers can more readily avoid.

9

ASIC has been expecting a return to historical placement levels, as noted in its public disclosures. Unanticipated industry-level events have delayed this reversion to the norm, which ASIC still expects to occur. Nevertheless, great uncertainty remains. Increasingly, ASIC has assumed risks on homes dropped by standard carriers and residences whose owners are seriously delinquent in their mortgage loan payments.

C.  **Expenses**

The rate filings that the Department approved include a disclosure of expenses. ASIC incurs the following categories of expenses:

- **Commissions to Agencies and Expense Reimbursements to Servicers**: This category consists of commissions paid to licensed insurance agencies and payments to servicers or their affiliates for reimbursement of placement-related expenses, typically up to a capped amount. Commissions paid to servicer affiliated agencies have historically been comparable to those in the standard homeowners market.

- **Other underwriting expenses**: This category encompasses "other acquisition expenses" and "general expenses." "Other acquisition expenses" are expenses of acquiring business other than commissions and expense reimbursements. Costs associated with mailings to prospective insureds and salaries of employees who do not work on a commission basis are included in this category. For ASIC, this category includes the cost of exposure tracking, processing and activities to monitor insurance coverage, which are prerequisites for lender-placed insurance. ASIC's "general expenses" include the costs of insurance operations, including policy issuance, servicing insurance policies, claims processing, IT, and administrative overhead.

- **Taxes, licenses and fees**: This category includes all taxes and miscellaneous fees that ASIC pays, excluding federal income taxes.

- **Ceded reinsurance expense**: A significant cost of the LPI business is ceded catastrophe premium paid to reinsurers not associated with mortgage servicers. As an integral part of its enterprise risk management program, ASIC purchases this coverage to manage its overall catastrophic risk exposure and to ensure its ability to pay claims.

D.  **Reinsurance Ceded to Servicer-Affiliated Reinsurers**

ASIC has reinsurance agreements with certain property and casualty reinsurance companies affiliated with our mortgage servicer clients. All of ASIC's current reinsurance agreements with such entities are on a quota share basis. In other words, the servicer-affiliated reinsurers share in the premiums earned and proportionally in the losses that arise from the policies on which the premiums were paid. ASIC also requires these reinsurers to have adequate capital or to post collateral, such as funds withheld or letters of credit.

E.  **Fees ASIC Earns**

ASIC charges fees to some of its mortgage servicer clients, in addition to LPI premiums on policies placed on their behalf.

- ASIC receives fee income from some clients to provide insurance related services. These fees relate primarily to support services provided to lenders for hazard insurance processing.

- As is customary in the industry, ASIC retains a ceding commission to compensate it for various expenses relating to the premium it cedes to reinsurers.

IV. Conclusion

LPI exists because it meets important needs of homeowners, lenders, and investors. It provides a safety net when standard insurance is simply not available. It is a critical component of the national residential mortgage system. But it is not "forced" on anyone. Yes, LPI is more expensive than standard insurance, but the difference in price reflects the greater risk that LPI carriers assume. The Department has indicated that it is interested in looking at all aspects of the market for LPI and in addressing any problems that it may find there. As the leader of the industry, we look forward to a constructive dialogue with the Department aimed at exploring ways to address any concerns the Department identifies in the course of its investigation.

>Respectfully submitted,
>
>John Frobose
>
>President, American Security Insurance Company