Testimony of Birny Birnbaum on behalf of the Center for Economic Justice[1]

Public Hearing on Force-Placed Insurance before the
New York Department of Financial Services

May 21, 2012

1.    **Summary of Testimony**

A.  The Lender-Placed Home Insurance (LPI) market is characterized by reverse competition, in which the cost of insurance placed on the borrower's loan is pushed up by LPI insurers in competition for servicers' business.

B.  The LPI market is not beneficially competitive to consumers, as evidenced by numerous measures, including market concentration, high prices, low loss ratios, insurer profitability and kickbacks to servicers.

C.  Because of reverse competition, stringent regulation of insurance rates is necessary. The Department of Financial Service's credit insurance regulations acknowledge the problem of reverse competition and the need for vigorous oversight of credit insurance rates.

D.  Because of reverse competition, LPI insurer expenses cannot be deemed reasonable simply because the insurer incurred those expenses. With reverse competition, insurers will provide considerations to lenders and such expenses are not reasonably included in rates or passed on to borrowers.

E.  Expenses permitted in LPI rates should include only those for activities directly and uniquely associated with the provision of LPI insurance. Expenses associated with servicing other the provision of LPI insurance must be excluded from rates. Such excluded expenses include commissions to servicers, tracking expenses and captive reinsurance administrative fees.

F.  A reasonable permissible or minimum loss ratio for LPI in New York is at least 80%. New York LPI consumers have been overcharged by $500 million since 2004 and continue to be overcharged by over $275,000 per day.

G.  Insurer excuses for maintaining excessive rates are unsupported by any evidence, actuarial principles or logic and are without merit.

H.  Recent actions by state attorneys general and Fannie Mae challenge state insurance regulators to interpret and implement requirements for LPI rates to be "commercially reasonable."

---

[1]  The Center for Economic Justice is a non-profit organization that advocates on behalf of low-income and minority consumers on insurance, credit and utility issues.


PLAINTIFF'S
EXHIBIT
6

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

I. Current LPI rates are clearly excessive and in violation of statutory rate standards. The very low loss ratios alone indicate excessive rates. Further, as soon as servicer-affiliated producers stopped accepting commissions, the LPI rates became excessive because an expense included in the filed rate was eliminated. The Department should act immediately to disapprove current LPI rates and force LPI insurers to file new rates that meet the statutory rate standards and exclude unreasonable expenses. In forcing LPI insurers to file new rates, the Department should define "commercially reasonable" LPI prices as rates that produce an expected loss ratio of 80% or greater.

J. The single most effective action by the Department to stop LPI abuses and to better align the interests of the servicer with the borrower is require LPI insurers to reduce rates to levels sufficient to cover the expected costs associated with the provision of insurance and to wring out unreasonable expenses associated with other servicing activities. By doing this, the Department will eliminate LPI as a profit center for servicers, eliminate the market incentives for servicers to unnecessarily place LPI and eliminate incentives for unnecessary activities whose purpose is to share LPI revenue and profits with servicers.

K. CEJ fully supports the recommendations of NEDAP regarding rates, disclosure, servicers continuing the borrowers' voluntary coverage, timeliness of refunds and limits on retroactive billing of borrowers. In addition, CEJ recommends that the Department and LPI vendors utilize focus-group testing and the insights of behavioral economics to dramatically improve LPI notices and disclosures to borrowers.

## 2.  Qualifications

I am a consulting economist and former insurance regulator specializing in insurance rates, regulation and policy, with particular expertise in credit-related insurance and insurance ratemaking and risk classification. I have worked on credit-related insurance issues for over 20 years and lender-placed insurance, specifically, for 18 years. I have been accepted as an expert on economic and actuarial issues related to credit-related insurance, including lender-placed insurance and title insurance, in many administrative and judicial proceedings.

## 3.  Description of Lender-Placed Insurance (LPI) Products and Markets

LPI, or force-placed insurance, is insurance placed by the loan servicer on the collateral underlying the loan. LPI protects the lender's collateral in the event the borrower fails to maintain insurance protecting the collateral. LPI is common for auto and real property loans. My testimony today discusses LPI placed and sold in connection with real-estate secured loans.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Mortgage loan agreements include a requirement that the borrower maintain insurance to protect the property serving as collateral for the loan. In addition, mortgage agreements typically include a requirement that the borrower's insurance policy include a lender loss payee endorsement.[2] This endorsement provides significant protection for the lender, including coverage for the lender even if coverage ceases for the borrower because of her non-compliance with policy provisions. The endorsement also allows the lender to continue coverage if the borrower fails to pay premium:

> In the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from, and within one hundred and twenty (120) days after, due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefore. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said premium written notice by the Lender.

Mortgage loan servicers typically contract with an outside vendor to monitor whether borrowers are maintaining the required insurance, including requirements that the insurance policy or policies have:

- sufficient coverage amount to repair or replace the property if destroyed;

- cover the relevant perils, including fire, wind and flood, for example; and

- been issued by an insurance company with acceptable financial strength, as measured by a minimum financial strength rating by a credit rating agency.

The loan servicer provides the vendor with access to loan data, which generally includes insurance information obtained during the loan closing. The vendor utilizes automated computer systems to monitor the insurance coverage, including automated interaction with insurance companies to obtain insurance coverage information. These automated systems produce correspondence to the borrower if the borrower fails to provide evidence of the required insurance.

In connection with the monitoring of the servicer's portfolio of loans for evidence of required insurance, the insurance tracking vendor is typically the insurance company issuing the LPI policy or policies or an entity associated with an insurance company issuing the LPI policy or policies to the servicer. A mortgage servicer is likely to have LPI policies for normal hazards (such as fire) and for other perils not covered by a standard homeowners policy, such as flood, excess flood, wind and excess wind.

---

[2] Appendix A contains the standard lender loss payee endorsement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

All residential property insurance policies (homeowners and dwelling fire) exclude flood as a covered peril (or cause of loss) and borrowers in designated flood areas are required by lenders to purchase a flood insurance policy from the federal government's National Flood Insurance Program. In many coastal states, insurers have excluded wind (hurricane) coverage from the standard residential property insurance policy in certain parts of the state and, consequently, borrowers must purchase a wind-only policy from a state-operated insurance program, like the Texas Windstorm Insurance Association.

### 3.1   LPI is a group master policy

The LPI insurance policy sold to the servicer is a group insurance master policy. Group insurance means that the policy covers a group of properties and not just a single property like the homeowners insurance policy purchased by a borrower. A master policy means that the policy covers all eligible properties and, as a property becomes eligible for coverage, a certificate of coverage for the individual property is issued under the master policy.

The LPI insurance policy provides that coverage begins on any property in the servicer's covered mortgage loan portfolio at the instant that the borrower's voluntary policy ceases to provide the required coverage. The LPI policy provides coverage, for example, if the borrower's homeowners insurance policy is canceled by the borrower or the insurance company or lapses because of non-payment of premium. To ensure that the property serving as collateral for its loans is always protected by insurance, the LPI policy provides coverage whenever the borrower's required insurance fails to remain in-force – even if the servicer or its vendor do not discover this failure of insurance coverage for days or weeks after the borrower's policy coverage has ended. The LPI group policy covers all properties in the servicer's loan portfolio and provides coverage as needed.

The vendor's automated systems issue a temporary binder of insurance coverage – retroactive to the date and time the borrower's coverage ceased to be in-force – along with correspondence to the borrower on behalf of the servicer that such binder has been issued and the premium for the LPI has been added to the borrower's loan amount. The correspondence informs the borrower that the LPI coverage will be canceled if the borrower provides the required evidence of insurance coverage.

The LPI insurance company or its associated vendor providing the loan tracking and other LPI-related services to the servicer bills the lender on a monthly basis for all the insurance provided. The LPI insurance company or vendor, on behalf of the loan servicer, removes the amount of the LPI premium form the borrower's escrow account, debits the escrow account if insufficient funds are available or adds the LPI premium to the borrower's loan amount.

If the borrower provides evidence that there was no lapse in required insurance coverage, the LPI insurance company will refund the premium paid by the servicer and the servicer will refund the LPI amounts charged to the borrower's loan. Testimony at this hearing indicates that 10% to 15% of LPI insurance is flat-cancelled, which means the LPI policy was erroneously placed.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

If, after the temporary binder has been issued and after a certain period of time, the borrower fails to provide evidence of required insurance, the LPI insurance company issues a certificate of insurance from the master LPI policy. The certificate of insurance names both the servicer and the borrower as insureds covered by the policy.

### 3.2   Servicer Recovers LPI Premiums Even In Event of Foreclosure

The servicer recovers the LPI premium it has paid to the LPI insurer, even in the event that a borrower defaults and there is a foreclosure or short sale because the LPI premiums are paid by the owner of the loan (the investor) to the servicer out of the proceeds from the foreclosure or short sale.

### 3.3   LPI Coverage is Limited

LPI coverage is that of a dwelling fire policy, typically providing only hazard protection. Coverages typically included in a homeowners policy and generally not included in the LPI policy are liability, theft, personal property and additional living expense (ALE) in the event of a claim. The absence of coverage for personal property and ALE can result in a significant difference in claim costs from a catastrophe event between LPI and homeowners policies.

### 3.3   LPI Rates and Premium Charges

Rates for LPI are very simple because there is no individual underwriting of properties. Any property in the portfolio is eligible for coverage and the rate for every property is the same, with the exception that, in a few states, LPI insurers use rating territories. LPI insurers do not use rating territories in New York.

Rates for LPI insurance are an amount per $100 of coverage. The premium is determined simply by multiplying the rate times the amount of coverage in $100s. If the rate is $1.20 per $100, as is the case for LPI insurers in New York, the premium on a property with $300,000 of coverage is $3,600.

The coverage is amount is determined in one of three ways – the coverage amount on the last known voluntary policy, the replacement cost of the property or the unpaid principal balance.

### 4.   LPI Market Participants and Results

There has been dramatic growth in the amount of LPI insurance countrywide and in New York over the past five years. Table 1 shows statewide totals for New York LPI gross written premium, net written premium and earned premium. The data are compiled from the creditor-placed home columns of Credit Insurance Experience Exhibit (CIEE) to the statutory annual statement. The table understates the actual amount of New York LPI premium because QBE Insurance Corporation and QBE Specialty Insurance Company did not correctly report their LPI experience in the CIEE and, consequently, the experience of the two insurers is not included. The data for these two insurers would show up in years 2009 through 2011. Even in the absence of the QBE data, the table shows significant growth in LPI premium written in New York.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### Table 1[3]
### New York LPI Premium, 2004-2011

| Year | Gross Written Premium | Net Written Premium | Earned Premium |
|---|---|---|---|
| 2004 | $55,566,227 | $28,795,446 | $28,833,666 |
| 2005 | $72,686,801 | $32,715,942 | $29,992,876 |
| 2006 | $100,753,850 | $48,242,893 | $41,769,062 |
| 2007 | $135,687,791 | $72,380,384 | $60,836,573 |
| 2008 | $173,405,889 | $94,217,189 | $83,632,490 |
| 2009 | $237,899,307 | $141,612,916 | $119,193,737 |
| 2010 | $262,582,431 | $144,579,586 | $143,830,768 |
| 2011 | $269,669,199 | $168,483,441 | $152,178,816 |
| 2004-11 | $1,308,251,495 | $731,027,797 | $660,267,989 |

Table 2 shows the amount of paid and incurred claims and loss ratios for New York over the past eight years. Paid claims represent dollars spent during the year for claims. Incurred claims represent paid claims plus changes in reserves. The paid loss ratio is paid claims divided by written premium, while the incurred loss ratio is incurred claims divided by earned premiums. Paid loss ratios are generally lower than incurred loss ratios, indicating that LPI insurers have established reserves for expected claims that have not yet been reported. American Security's annual statement financial data shows that in each of the past five years, American Security has significantly reduced its estimates initial estimates of losses[4].

Table 3 shows the gross written premium for Assurant and QBE / Balboa in New York from 2004-2011. As explained above, the QBE amounts are understated because of reporting errors by QBE Insurance Corporation and QBE Specialty Insurance Company. Together, Assurant and QBE account for the entire New York LPI market.

---

[3] Appendix B includes detailed LPI data by individual insurer.
[4] See Appendix C, which contains financial highlights of American Security from the 2011 annual statement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 2**
**New York LPI Claims and Loss Ratios, All Insurers**

| Year | Claims Paid | Claims Incurred | Paid LR | Incur LR |
|------|------------|-----------------|---------|----------|
| 2004 | $9,697,959 | $8,890,015 | 33.7% | 30.8% |
| 2005 | $7,160,826 | $6,994,609 | 21.9% | 23.3% |
| 2006 | $10,381,964 | $10,669,942 | 21.5% | 25.5% |
| 2007 | $10,124,351 | $11,481,755 | 14.0% | 18.9% |
| 2008 | $11,015,223 | $12,271,453 | 11.7% | 14.7% |
| 2009 | $21,616,586 | $24,171,220 | 15.3% | 20.3% |
| 2010 | $26,060,882 | $29,515,338 | 18.0% | 20.5% |
| 2011 | $38,515,613 | $41,843,150 | 22.9% | 27.5% |
| 2004-11 | $134,573,404 | $145,837,483 | 18.4% | 22.1% |

**Table 3**
**Assurant and QBE / Balboa New York LPI Gross Written Premium, 2004-2011**

| Year | Assurant | QBE / Balboa |
|------|----------|--------------|
| 2004 | $46,815,426 | $8,750,801 |
| 2005 | $65,217,345 | $7,469,456 |
| 2006 | $92,265,215 | $8,488,635 |
| 2007 | $122,884,361 | $12,803,430 |
| 2008 | $159,042,795 | $14,363,094 |
| 2009 | $172,607,633 | $65,291,578 |
| 2010 | $200,651,456 | $61,930,975 |
| 2011 | $205,227,821 | $64,441,378 |
| 2004-11 | $1,064,712,052 | $243,539,347 |

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Table 4 shows the paid and incurred loss ratios of Assurant and QBE / Balboa LPI business in New York from 2004-2011.   In most years and in aggregate over the period, paid loss ratios are less than incurred loss ratios.

**Table 4**
**Assurant and QBE / Balboa New York LPI Loss Ratios, 2004-2011**

| Year | Assurant Paid LR | Assurant Incur LR | QBE/Balboa Paid LR | QBE/Balboa Incur LR |
|---|---|---|---|---|
| 2004 | 32.0% | 29.7% | 44.8% | 37.4% |
| 2005 | 19.4% | 21.3% | 44.2% | 39.6% |
| 2006 | 18.9% | 23.5% | 50.4% | 45.2% |
| 2007 | 13.0% | 18.0% | 22.2% | 26.2% |
| 2008 | 11.0% | 14.1% | 18.5% | 19.9% |
| 2009 | 16.8% | 18.8% | 12.1% | 24.7% |
| 2010 | 19.4% | 23.2% | 14.4% | 14.3% |
| 2011 | 24.8% | 27.8% | 18.3% | 26.7% |
| 2004-11 | 18.6% | 21.8% | 17.7% | 23.2% |

Table 5 shows incurred loss ratios for homeowners insurance and for LPI home countrywide and in New York from 2004 to 2011.  LPI loss ratios are consistently far less than homeowners loss ratios. Table 5 and Figure 1 show that LPI loss ratios are not only lower than homeowners loss ratios, but do not track increases in homeowners loss ratios resulting from major catastrophe events.   Homeowners loss ratios spiked in 2008 and 2011 because of major catastrophe events, but LPI loss ratios remained low.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 5**
**Loss Ratios for Homeowners and LPI Home, 2004–2011[5]**

*Countrywide*

| Year | Homeowners | LPI Home |
|------|------------|----------|
| 2004 | 66.0% | 33.1% |
| 2005 | 75.2% | 53.5% |
| 2006 | 48.2% | 28.3% |
| 2007 | 50.4% | 20.5% |
| 2008 | 70.7% | 23.2% |
| 2009 | 59.3% | 20.3% |
| 2010 | 60.5% | 18.1% |
| 2011 | 76.0% | 26.5% |

*New York*

| Year | Homeowners | LPI Home |
|------|------------|----------|
| 2004 | 47.3% | 30.8% |
| 2005 | 43.3% | 23.3% |
| 2006 | 42.7% | 25.5% |
| 2007 | 41.1% | 18.9% |
| 2008 | 39.8% | 14.7% |
| 2009 | 40.7% | 20.3% |
| 2010 | 48.4% | 20.5% |
| 2011 | 56.6% | 27.5% |

[5] Data Sources: Homeowners 2004–2010, *NAIC Report on Profitability by State by Line in 2010*; Homeowners 2011, preliminary annual statement state page data compiled by Birnbaum; LPI Home, NAIC Credit Insurance Experience Exhibit data compiled by Birnbaum. Appendix E contains selected pages from *NAIC Profitability Report*.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Figure 1:  Catastrophe Losses for Homeowners Not Present for LPI Home**



**Table 6**
**New York LPI Overcharges, 2004-11**
**Based on 80% Loss Ratio Standard**

| Year | Earned Premium | Actual Loss Ratio | % Excessive | Amount Excessive | Daily Overcharge |
|------|----------------|-------------------|-------------|------------------|------------------|
| 2004 | $28,833,666 | 30.8% | 61.5% | $17,721,147 | |
| 2005 | $29,992,876 | 23.3% | 70.8% | $21,249,615 | |
| 2006 | $41,769,062 | 25.5% | 68.1% | $28,431,634 | |
| 2007 | $60,836,573 | 18.9% | 76.4% | $46,484,379 | |
| 2008 | $83,632,490 | 14.7% | 81.7% | $68,293,174 | |
| 2009 | $119,193,737 | 20.3% | 74.7% | $88,979,712 | |
| 2010 | $143,830,768 | 20.5% | 74.3% | $106,936,596 | $292,977 |
| 2011 | $152,178,816 | 27.5% | 65.6% | $99,874,879 | $273,630 |
| 2004-11 | $660,267,989 | 22.1% | 72.4% | $477,971,136 | |

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 4.1   *New York LPI Rates Were and Are Extremely Excessive*

The very low loss ratios shown in table 2 indicate that LPI rates were excessive. As explained in more detail below, a reasonable loss ratio for LPI is 80% or higher. Based on an 80% loss ratio standard, New York consumers were overcharged by about $500 million from 2004 through 2011, as shown in Table 6. Rates continue to be grossly excessive in violation of statutory requirements that rates be reasonable and not excessive. New York mortgage borrowers are being overcharged more than $275,000 each day current LPI rates remain in effect.

### 4.2   *LPI Insurance is Extremely Profitable for Insurers and Servicers*

Appendix C shows some of the financial highlights for American Security taken from the 2011 annual statement. The data show LPI is very profitable for American Security and its servicer-partners:

- Net pre-tax income for American Security was 33.5%, 42.0% and 31.8% of net written premium in 2009, 2010 and 2011, respectively

- Net after-tax income for American Security was 22.8%, 28.0% and 22.2% of net written premium in 2009, 2010 and 2011, respectively

- After-tax return on policyholder surplus for American Security was 41.7%, 50.5% and 44.8% of net written premium in 2009, 2010 and 2011, respectively

- From 2009 to 2011, American Security distributed $1.143 billion in dividends to policyholders – fully 29.5% of net premiums written over the period $200 million more than net after-tax income for the period.

- As shown in Table 8, below, captive reinsurance partners of American Security received hundreds of millions of reinsurance premiums in 2011. The amounts reported for paid claims and known claim reserves for the four captive reinsurers in Table 8 were only 4% to 5% of ceded premium.

- American Security reduced its initial estimates of expected claims by 3.3%, 4.0% and 3.0% in 2009, 2010 and 2011 respectively, indicating that initial reserves were too high.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

5.     **Recent Important Activities Related to LPI**

There have been significant actions within the past year by federal agencies, state
attorneys general, state agencies and Fannie Mae related to performance of mortgage loan
servicers.  These actions include new performance standards for LPI, which impact the state
insurance department's oversight of LPI.

*5.1     AG Settlement*

Earlier this year, most state attorneys general and the United States Department of Justice
entered into settlement agreements with several mortgage servicers.  The settlement agreements
included requirements for LPI.  Appendix C includes the relevant pages from the settlement with
Bank of America.  Of particular note is the following requirement:

> 8.  Any force-placed insurance policy must be purchased for a commercially
>     reasonable price.

*5.2     Fannie Mae*

Fannie Mae is a government-sponsored enterprise that, among other things, purchases
mortgage loans and contracts with servicers to service those loans.  Fannie, which owns or
guarantees a large portion of all outstanding mortgages, requires that insurance be in place on
property serving as collateral for its mortgage loans.  Stated differently, Fannie requires servicers
to have LPI policies in place to ensure continuous insurance coverage for Fannie's mortgage
properties.

In March, 2012, Fannie issued Fannie Mae Servicing Guide Announcement SVC-2012-
04 announcing significant changes to its LPI requirements.[6]  Significant sections are cited below:

**Lender-Placed Insurance Coverage Amount and Deductible Requirements**

Fannie Mae is amending and clarifying its requirements related to the amount of lender-
placed insurance coverage as shown below:

- For mortgage loans that are current to 119 days delinquent, the insurance coverage
  amount should be issued at the borrower's last known coverage amount.

- For mortgage loans that are currently 120 days or more delinquent or for those loans that
  become 120 days delinquent after the effective date of this Announcement, the insurance
  coverage amount must be changed to the lesser of:

---

[6] Available at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2012/svc1204.pdf

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

- the unpaid principal balance (UPB) or

- 100% of the insurable value of the improvements (as established by the property insurer).

The servicer may use the last known coverage amount for the borrower's property insurance in lieu of the insurable value of the improvements.

### *Notifying Borrower of Lender-Placed Insurance*

Fannie Mae is changing the requirement that the servicer must contact the borrower at least once by letter before placement of any lender-placed insurance coverage. With this Announcement, the servicer must contact the borrower at least twice by letter prior to obtaining lender-placed insurance coverage. In addition, the servicer must notify the borrower in writing when it is required to change the lender-placed insurance coverage amount due to the delinquent status of the mortgage loan.

### Acceptable Lender-Placed Insurance Carriers

Servicers must ensure that the lender-placed insurance carriers they use are filed and admitted in every state in which they service loans for Fannie Mae. For carriers and lender-placed programs that do not meet this requirement, Fannie Mae will allow the use of excess and surplus lines coverage during the filing period, up to a maximum of 180 days from the date of this Announcement.

Finally, the Fannie announcement requires rates be "commercially reasonable," but must exclude servicer commissions, tracking costs and other expenses not associated with "actual cost of the lender-placed insurance premium."

The lender-placed vendor selected by the servicer must have premium rates that are competitively priced and commercially reasonable. The servicer must have a documented process in place that demonstrates that the vendor meets this requirement. Fannie Mae reserves the right to require that a servicer change its lender-placed insurance provider if the provider has not demonstrated its ability to file rates within a timely manner.

### Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must **exclude:**

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

- any lender-placed insurance commission earned on that policy by the servicer or any related entity,

- costs associated with insurance tracking or administration, or

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

## 5.3   *DFS Agreement with Ocwen Financial on Mortgage Servicing Practices*

The Department entered into an agreement with Ocwen Financial in December 2011 regarding mortgage servicing practices.  The agreement contains a number of service standards for LPI, including:

61.  To the extent Servicer purchases a master hazard insurance policy for force-placed it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred.

This service standard is consistent with rate standards for credit-related insurance and better reflects insurance regulatory rate standards than the "commercially reasonable" standard found in the prior documents cited.

## 5.4   *Insurance Regulators Responsibility for LPI Rates*

The settlements with servicers and the Fannie servicing guidelines for LPI both require LPI rates to be "commercially reasonable."  This servicing standard requires action by state insurance regulators.  State insurance statutes require that rates be not excessive, not inadequate, not unfairly discriminatory and reasonable in relation to benefits provided.  "Commercially reasonable" is not a concept found in insurance rate regulation.

In addition, servicers will interpret "commercially reasonable" – as some servicer witnesses testified in this proceeding on May 18 – to mean rates available in the market.  In a market characterized by reverse competition and with only two providers who charge the same or similar rates, such an interpretation provides no consumer protection.

The Department of Financial Services and other state insurance regulators should quickly establish a substantive interpretation of "commercially reasonable" to be consistent with state insurance rate standards and to exclude unreasonable expenses, including those listed in the Fannie servicing announcement.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**6.      Reverse Competition, Market Failure and the Need for Strict Regulatory Oversight**

Reverse competition describes a market structure in which consumers/borrowers exert little or no market power over prices. Instead of competing for individual consumers, insurers compete for the entities with the market power to steer the ultimate consumer to the insurer. Insurers compete for the servicer's business by providing considerations to the servicer, with the cost of such considerations passed on to the borrower. Greater competition for the lender's business leads to higher prices of credit-related insurance, including LPI, to the borrower. This form of competition, which results in *higher* prices to consumers, is called reverse competition.

New York, as have many other states, recognizes the problems with reverse competition in credit-related insurance markets. New York insurance regulation 27A states:

Section 185.0
(b) In the marketing of credit insurance, the inferior bargaining position of the debtor creates a captive market in which, without appropriate regulation of such insurance, the creditor can dictate the choice of coverages, premium rates, insurer, agent and broker, with such undesirable consequences as: excessive coverage (both as to amount and duration); excessive charges (including payment for nonessential items concealed as unidentifiable extra charges under the heading of insurance); failure to inform debtors of the existence and character of their credit insurance and the charges therefore, and consequent avoidance of the protection provided the debtor by such coverage.

(c) In the absence of regulation, premium rates and compensation for credit insurance tend to be set at levels determined by the rate of return desired by the creditor in the form of dividends or retrospective rate refunds, commissions, fees, or other allowances, instead of on the basis of reasonable cost. Such reverse competition, unless properly controlled, results in insurance charges to debtors that are unreasonably high in relation to the benefits provided to them.

*6.1    Consumers Are Especially Vulnerable to Excessive LPI Rates*

The incentives and potential for excessive LPI rates are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Servicers have financial incentive to force-place the insurance because the premium includes commission and other consideration for the servicer. With some servicers, the insurance is reinsured through a captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement of the coverage.[7]

---

[7] See, for example, "Ties to Insurers Could Land Mortgage Services in More Trouble," Jeff Horwitz, *American Bankers*, November 10, 2010.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

Borrowers are vulnerable to excessive rates for LPI insurance because the borrowers / consumers exert no market power in the setting of these rates. The insurance is force-placed on the borrower and the borrower has no say or decision in the amount or type of coverage placed. In addition, there is no downward market pressure on rates; the vendors/insurers offering LPI do not compete on the basis of price, but on the basis of services provided to the lender and compensation and other considerations provided to the lender or its affiliates.

## 7.    Unreasonable Expenses

Because of reverse competition, LPI rates are excessive, in part, because of unreasonable expenses. To compete for servicer business, LPI insurers must provide considerations to the lender. This cost of these considerations – payments by the LPI insurer to the servicer or expenditures by the LPI insurer to subsidize the servicer's cost for non-LPI activities – inflate the rates for LPI. Unreasonable expenses included in LPI rates include:

- Tracking/Servicing Activities Unrelated to the Provision of LPI
- LPI Commissions
- Captive Reinsurance Administrative Costs
- Affiliate Transactions at Above-Market Prices

### 7.1    Tracking and other Servicer Activities

Table 7 provides a list of LPI-related activities and identifies the activities as associated with servicing a portfolio of loans versus the issuance and administration of the LPI master policies and individual property coverages.

Although most of the activities in Table 7 are servicing activities, most or all of these activities are typically performed by the LPI vendor for the servicer. Some of these services may be billed separately from the LPI premium, but some portion of the LPI insurer's expenses are for performing servicer activities not a part of the provision of LPI. Such expenses are unreasonable to include in LPI premium charges to borrowers.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

**Table 7**
**LPI-Related Servicing and Insurance Activities**

| Activity | Servicing vs. Insurance |
|---|---|
| *Tracking Insurance* | |
| Loading Insurance Information into Database | Servicing |
| Contacting Borrowers, Problems with Insurance | Servicing |
| Customer Service Borrowers Insurance Evidence | Servicing |
| Contacting Insurers/Agents Insurance Evidence | Servicing |
| | |
| *Placing Insurance* | |
| Notifying Insurer to Issue Binder or Policy | Servicing |
| Issuing Temporary Binder | Insurance |
| Determining Coverage Amount | Servicing |
| Servicer Payment to Insurer | Insurance |
| Billing Borrower for LPI Premium | Servicing |
| Setting up Escrow when necessary for LPI | Servicing |
| Refunds to Servicer | Insurance |
| Refunds to Borrower | Servicing |
| Issuing Permanent Policy | Insurance |
| Customer Service about Insurance Placement | Servicing |
| Customer Service about Borrower Refunds | Servicing |
| Customer Service about LPI Coverage | Servicing |
| Customer Service about LPI Claims | Insurance |

**7.2   *Commissions to Servicer-Affiliated Producers***

Testimony at this hearing has revealed that commissions paid to servicer-affiliated producers are not justified by any service provided by these producers and represent a kickback to the servicer for placing the LPI. When asked what activities the servicer-affiliated producers perform to justify the commissions, the responses included:

- Soliciting LPI providers
- Reviewing LPI form letters and other documents
- Third-party broker commissions are commonplace
- Broker commissions are an accepted and approved practice
- LPI broker commissions are similar to those in other lines of insurance
- Manage the LPI rating program
- Manage the LPI vendor relationship
- Quality review of the LPI vendor
- Commissions are a cost of doing business

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policyholder's needs while seeking the most competitive price for the product. Such activities simply do not exist in LPI because there are only two national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two vendors for proposals – and such activity is a rare event for most servicers.

Reviewing LPI form letters and other communication templates is the servicer's responsibility. A servicer-affiliated producer performing such review is performing servicer activity which should not be compensated for through LPI insurance premiums.

The fact that third-party broker commissions are commonplace or a standard industry practice in LPI or other lines of insurance is no justification for such commissions in the LPI market. There have been a variety of standard industry practices by servicers and insurers that were unfair and abusive to consumers – and which were not justified by virtue of many servicers or insurers engaging in the same practice. In the servicing realm, recent settlements between states and servicers have identified a number of unfair industry practices, such as robosigning foreclosure documents. In the insurance realm, steering of business based on contingent commissions, unfair use of retained asset account and abusive sales of financed single premium credit insurance, were industry standard practices, to name a few.

Other justifications cited by industry witnesses –managing the LPI vendor relationship and quality review of the LPI vendor – are responsibilities of the servicer and, to the extent the servicer-affiliated producer is performing these activities, the commissions to these producers represent a kickback of the LPI premiums to subsidize servicer activities.

In summary, industry witnesses have provided no justification for any LPI commissions to servicer-affiliated producers. Fannie Mae's new policy – to not reimburse servicers for any portion of LPI premiums paid as commission to servicer-affiliated producers – provides further evidence that no commissions to servicer-affiliated producers are warranted.

## 7.3    Captive Reinsurance

Captive reinsurance arrangements – in which the LPI insurer reinsures a portion of LPI business with a reinsurance company owned or affiliated with the servicer – are simply profit-sharing mechanisms designed to provide additional considerations to the servicer. These arrangements serve no substantive risk management purpose and, consequently, serve no purpose for the consumers/borrowers of LPI.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

    Table 8 shows information about four captive reinsurance arrangements managed by American Security Insurance Company.  The amount of reinsurance premium ceded ranges from about $29 million to over $360 million.  Paid losses plus known case (loss) reserves are only 4% to 5% of premium ceded.  Even adding the reported amounts for IBNR (incurred but not reported) reserves – reserves for claims the reinsurer does not know about but expects will occur and which, in all four cases, are significantly greater than paid claims plus known reserves – claims plus all reserves are only 10-13% of premium ceded.  The captive reinsurance arrangements are very profitable for the servicer's captive reinsurer.

**Table 8**
**American Security IC Captive Reinsurance, Selected Reinsurers**
**Schedule F, Part 3, Ceded Reinsurance, 2011 Annual Statement**
**($ 000)**

|  | Pelatis | Banc One | HSBC | Alpine Indemnity (PNC) |
|---|---|---|---|---|
| Reinsurance Premium Ceded | $30,535 | $363,012 | $28,686 | $34,052 |
| Paid Losses | $692 | $7,708 | $682 | $701 |
| Known Case Reserves | $883 | $6,596 | $757 | $696 |
| Known LAE Reserves | $56 | $422 | $48 | $45 |
| IBNR Loss Reserves | $2,327 | $27,476 | $2,201 | $1,934 |
| IBNR LAE Reserves | $179 | $1,853 | $132 | $151 |
|  |  |  |  |  |
| Paid Losses + Known Reserves | $1,631 | $14,726 | $1,487 | $1,442 |
| Percentage of Premium Ceded | 5.3% | 4.1% | 5.2% | 4.2% |
|  |  |  |  |  |
| Paid Losses + All Reserves | $4,137 | $44,055 | $3,820 | $3,527 |
| Percentage of Premium Ceded | 13.5% | 12.1% | 13.3% | 10.4% |

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

The arrangements should be prohibited because they create a conflict of interest between the servicer and the borrower. By having a financial interest in the price and placement of LPI through a captive reinsurance program, the servicer has a glaring conflict with the interest of the borrower for lower-cost LPI. Testimony of industry witnesses – "we can see that there might be a perception of a conflict, but it does not affect our practice" – does not address or eliminate the actual conflict of interest. The person who has a conflict of interest does not eliminate the conflict simply by saying, "I'm not affected by these financial incentives."

Regardless of whether the captive reinsurance arrangements are prohibited, the expenses associated with administering the arrangements should be excluded from LPI rates because these expenses provide no benefit for the borrower. The administrative expenses for captive reinsurance arrangements are likely substantial; the 2011 American Security Insurance Company statutory annual statement shows dozens of such arrangements.

## 7.4   *Affiliate Transactions*

LPI expenses for both Assurant and QBE include significant affiliate transactions. QBE First has testified that the QBE insurers pay a significant commission to QBE First to administer the LPI program. Schedule Y, Part 2 of the 2011 American Security Insurance Company annual statement shows American Security paid $$161,444,866 to Assurant, Inc for "management agreements and service contracts." Amounts paid for affiliated transactions above reasonable market prices should be excluded from LPI rates.

## 8.   Rate Standards and Ratemaking Methodology

New York Insurance Statutes § 2303 sets out the rate standards applicable to property casualty insurance:

> § 2303. Standards for rates. Rates shall not be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers.

Current LPI rates are not only excessive, but destructive of competition. Because of reverse competition, excessive rates include amounts used by insurers to provide consideration to servicers in exchange for the LPI business.

Testimony at the hearing described the nature of QBE's acquisition of the Balboa insurance books of business and included an initial payment (of around $700) plus profit sharing on LPI and other lines of business in exchange for an agreement by Bank of America to utilize QBE for LPI for at least ten years. It is unclear why insurance regulators approved this deal; it is effectively a referral fee for a guaranty of LPI business for ten years and eliminates any competition for 20% of the LPI market for ten years.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 8.1    Component Rating and Loss Ratio Rate Regulation

There are two methodologies used by state insurance regulators for credit-related insurance – component rating and loss ratio.  The NAIC Creditor-Placed Insurance Model Act includes the two methodologies, which are also found in other NAIC credit-related insurance models.  Section 8E of the model states[8]:

Alternative 1:
The schedule of premium rates shall not be excessive, inadequate or unfairly discriminatory.  In determining whether a schedule of premium rates are excessive, inadequate or unfairly discriminatory, the commission shall take into account past and prospective loss experience, general and administrative expenses, loss settlement and adjustment expenses, reasonable creditor compensation and other acquisition costs including insurance tracking costs, reserves, taxes, licenses, fees and assessments, reasonable insurer profit and other relevant data.

Alternative 2:
A schedule of premium rates shall provide for premiums that are not unreasonable in relation to the benefits provided by the form to which the schedule applies.  A premium rate or schedule of premium rates shall be presumed to be reasonable for purposes of this section if the rate or schedule or [sic] rates produces or may reasonably be expected to produce a loss ratio of sixty percent (60%) or greater.  Nothing in this subsection shall prohibit the commissioner from approving other loss ratios which may be found reasonable.

---

[8] The NAIC Creditor-Placed Insurance Model Act was strongly criticized by consumer advocates and some insurance regulators when adopted by the NAIC, arguing that the model act legitimizes many of the practices identified as unfair and abusive to consumers.  For example, the Act permits, in Section 8 E Alternative 1, the inclusion of tracking costs in the insurance premium, despite the fact that such an expense is clearly the responsibility of the lender as part of its loan servicing responsibility and, consequently, including tracking expenses in the insurance premium would appear to violate federal law – the Real Estate Settlement Procedures Act (RESPA) Section 2607 (a) prohibition against any fee, kickback or thing of value for business referrals.  Section 8D permits servicer-affiliated producer commissions and other payments to the servicer/lender for servicing – and not insurance – activities.  See National Consumer Law Center, *The Cost of Credit, 4th Edition*, page 383, citing Mark A. Chavez, *If You Can't Beat Them, Change the Rules:  The Industry Response to Forced-Place Insurance Litigation*, The Consumer Advocate, Vol. 3, Issue 5 (Nov/Dec 1997).  See also letters of April 30, 1996 and September 5, 1996 from NCLC, Consumers Union and the Consumer Federation of America to the NAIC regarding the proposed NAIC Creditor-Place Model Law, stating, "The model actually makes matters worse for the public.  No model act is preferable to this model act."

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 8.2   In Reverse-Competitive Market, Actual Expenses Can Not Be Considered Reasonable

Alternative 1 describes component rating – the traditional actuarial approach to ratemaking.  With component rating a rate is developed on the basis of reasonable component costs – expected claims, selling expenses, administrative expenses, profit and other costs.  Insurance regulators disapprove rates, based upon this methodology, if the profit provision is too high, the projected claims costs are too high, or expenses, including commissions, are too high.  With component rating, the reasonable rate is the sum of the reasonable component values.

There are problems using the component rating methodology for insurance subject to reverse competition, including LPI.  The component rating methodology requires the identification and determination of reasonable expenses.  In a normally competitive market, one might conclude that actual expenses incurred are reasonable expenses because competitive forces practically prevent an insurer from making unreasonable expenditures.  In a competitive market, an insurer would not be able to recoup unreasonable expenses in competitively-determined rates.

In markets characterized by reverse competition, however, insurers compete by providing considerations to the lender/servicer and, in the process of such competition, incur expenses which are unreasonable to include in the rate.  Stated differently, in a reverse-competitive market, the fact that an insurer incurred an expense does not mean that the expense is reasonable to include in the rate.

The loss ratio method methodology for setting rates establishes a minimum loss ratio and the rate is simply claim costs divided by that minimum loss ratio.  For example, if the claim costs for LPI were $0.32 per $100 of coverage and the minimum loss ratio was 80%, the maximum rate would be $0.32/0.8 which equals $0.40 per $100 of coverage.

The loss ratio methodology is based is based on a rate standard that premium charges must be reasonable in relation to benefits provided.  As a matter of public policy, some loss ratios, even if justified by a component rating analysis, are too low to meet the standard of reasonable benefits in relation to premium charge.  It is not uncommon for insurers to use component rating to justify very low loss ratios for many credit-related insurance products – typically relying on high expenses for such justification.

A second reason regulators use the loss ratio methodology is because of the difficulty in obtaining necessary information from insurers to evaluate the reasonableness of insurer expenses in reverse-competitive product markets.  The discussion above provides an indication of the types of information necessary to evaluate actual insurer expenses – data on personnel and non-personnel expenses by activity to determine what expenses are servicer subsidies, captive reinsurance administrative expenses, unreasonable affiliated transaction expenses and unreasonable servicer compensation, to name a few.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

With the loss ratio methodology, the regulator identifies the reasonable expenses associated with the LPI insurance and establishes the minimum loss ratio as 1 minus the percentage of premium represented by the sum of reasonable expenses. Such an analysis is provided below.

## 9.    Derivation of Permissible or Minimum Loss Ratio

Table 9 shows the derivation of a reasonable expected loss ratio. The table shows the derivation of the profit provision and provides reasonable ranges for profit provision, other acquisition expenses, general and administrative expenses and taxes, licenses and fees. The table presents percentage of premium ranges for certain expense items, recognizing that the expense percentage may vary based on size of insurer or other factors. However, the reality of the market is that two insurer groups write virtually all the LPI business in New York and every other state.

The derivation of the profit provision starts with an after-tax return on equity of 11% to 13%, which is reasonable in the current very low interest rate climate. The after-tax return is grossed up to a before-tax return using a tax rate of 35%. The before-tax return on equity is converted to a return on premium by dividing by the premium/equity ratio. A conservative leverage ratio of 2.0 is used, which is consistent with the premium/surplus ratio of American Security. The projected investment gain, as a percentage of premium, is subtracted from the before-tax return on premium to produce the profit provision. A range of 6% to 7% investment gain as a percentage of premium is used, consistent with the results of American Security. The indicated profit provision is a range of 1.5% to 4.0%.

No provision for commissions is included. Many servicer-affiliated producers have already stopped accepting commissions on LPI because of the new Fannie Mae policy and other servicer-affiliated producers will soon stop accepting commissions on LPI insurance. Further, servicer-affiliated producers do nothing to warrant a commission. Industry testimony about the activities of servicer-affiliated producers indicates the activities of these producers are really vendor management oversight by the servicers. The costs of these vendor management activities are servicer responsibilities and not a reasonable LPI insurance expense. In 2011 in New York, the average commission for the homeowners line was 14.7%.[9]

A range of 2% to 4% is provided for other acquisition expense. Unlike personal lines insurance, there is no advertising to consumers (borrowers). Many mortgage servicers – and certainly the larger mortgage servicers – operate in many or all states. Given that there are only two national LPI insurers and servicers know who these insurers are, the LPI insurers do not require significant expense to solicit business; rather, the LPI insurers will typically respond to solicitations.

---

[9]  Source or New York homeowners average commission is Annual Statement State Page data provided by NAIC and compiled by Birnbaum.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

In addition, the following activities, present for homeowners insurance, are not found for LPI.

- Development of complex underwriting and rating models
- Development of complex premium calculation models and software
- Underwriting of individual properties and policyholders, including credit reports, credit scores, claims history reports and other property-or-consumer specific data
- Interaction with individual policyholders to determine appropriate coverage amount and coverages for the policy
- Sales and underwriting activity not resulting in a policy, including, for example, obtaining credit scores and loss history reports for applicants who do not purchase a policy.

In 2010, the total selling expense in NY for homeowners insurance, as reported in the NAIC Profitability Report was 22.6%. If we subtract 15% for commissions, other acquisition expenses account for about 8% of New York homeowners premium. Given the far fewer activities and lesser other acquisition expenses for LPI than homeowners, the proposed LPI range for other acquisition of 2% to 4% is reasonable.

A range of 3% to 4% is provided for general and administrative expense. The expenses associated with a non-underwritten group blanket policy must be significantly less than general and administrative expenses associated with homeowners insurance. The following expenses for homeowners insurance are not found for LPI:

- Maintenance of detailed underwriting, rating and coverage information on individual policyholders
- Billing of individual policyholders

In 2010, the general expenses in New York for homeowners insurance, again as reported in the NAIC Profitability Report was 4.5%  A smaller provision for LPI general expenses is reasonable.

A range of 2.5% to 3.0% is used for taxes, licenses and fees. This range is consistent with the amounts reported for homeowners insurance in the 2010 NAIC Profitability Report and the 2011 annual statement for American Security.

The result is a non-claims expense provision of 9% to 15%, leaving 85% to 91% for claim-related expenses, which includes expected loss and loss adjustment expense.  Loss and loss adjustment expense includes a provision for catastrophe claims and catastrophe reinsurance expenses.

This analysis demonstrates that a permissible or minimum loss ratio of 80% is certainly reasonable for insurers and may be too low based on a more detailed analysis of actual LPI insurer expenses.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### Table 9
### Derivation of Permissible or Minimum Loss Ratio

|   |   | Low | High |
|---|---|---|---|
| 1 | Selected After-Tax Return on Equity | 11% | 13% |
| 2 | Tax Rate | 35% | 35% |
| 3 | Before Tax Return on Equity | 17% | 20% |
| 4 | Premium/Equity Ratio | 2.0 | 2.0 |
| 5 | Needed Return on Premium (3/4) | 8.5% | 10.0% |
| 6 | Investment Income % of Premium | 7% | 6% |
| 7 | Profit Provision (6-7) | 1.5% | 4.0% |
| 8 | Commission | 0.0% | 0.0% |
| 9 | Other Acquisition | 2.0% | 4.0% |
| 10 | General Admin | 3.0% | 4.0% |
| 11 | Taxes, Licenses, Fees | 2.5% | 3.0% |
| 12 | Sum of Non-Claim Expenses | 9.0% | 15.0% |
| 13 | Provision for Loss and LAE | 91.0% | 85.0% |

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### 9.1    *An Updated NAIC Model Would Supports a Minimum Loss Ratio Standard of 80%*

The NAIC Creditor-Placed Model Act provides, as one regulatory approach, a minimum loss ratio of 60%. However, within the remaining 40% of premium, the model allows up to 20% commission to producers plus expenses associated with loan servicing, such as insurance tracking and profit-sharing with the servicer.[10]  When these unreasonable expenses are excluded, the reasonable minimum loss ratio is over 80%.

### 10.    Evaluation of Claim Costs

Servicers and LPI insurers testifying at this hearing have argued that high LPI rates are justified because, among other reasons, there is no underwriting of individual LPI properties. The servicers and LPI insurers have argued that they must insure vacant properties and properties that would otherwise be uninsurable.  While it is logical that claims per unit of exposure would be higher for non-underwritten insurance than for underwritten insurance, whether that is actually the case is an empirical question.

Offsetting the higher expected claims resulting from lack of individual underwriting is the lesser coverage of LPI relative to homeowners insurance.  LPI typically provides hazard coverage only and does not include coverage for theft, liability, personal property or additional living expense (ALE) in the event of a claim.  The absence of personal property and ALE can make a significant difference in the event of catastrophe claims.

Table 5, above, shows that LPI loss ratios are roughly one-third of homeowners loss ratios on a countrywide basis and roughly one-half in New York.  If we assume that LPI rates are, on average, twice as much as homeowners rates, then LPI loss ratios that are one-half of homeowners loss ratios indicate that claims per unit of exposure are roughly the same for both products.

---

[10]  NAIC Creditor-Placed Insurance Model Act, Section 8
D. Prohibited rebates or inducements do not include:
(1)The providing of insurance tracking and other services incidental to the creditor-placed insurance program;
(2) The paying of commissions and other compensation to a duly licensed and appointed insurance producer, whether or not affiliated with the creditor;
 (3) The paying to the creditor policyholder of group experience rated refunds or policy dividends; and
(4) The paying to the creditor of amounts intended to reimburse the creditor for its expenses incurred incidental to the creditor-placed insurance program (such as costs of data processing, mail processing, telephone service, insurance tracking, billing, collections and related activities); provided that these payments are approved in a manner consistent with the procedures in Section 8 and are calculated in a manner that does not exceed an amount reasonably estimated to equal the expenses incurred by the creditor.
E. An insurer that pays commissions to producers for creditor-placed insurance that are greater than twenty percent (20%) of the net written premium shall be required to demonstrate the commissions are not unreasonably high in relation to the value of the services rendered.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

In addition to lesser coverage, LPI claims per unit of exposure may be lower than for homeowners because of the distribution of LPI exposures and the lack of territorial rating for LPI in most states. Servicers and LPI insurers have testified at this hearing that their LPI exposures are concentrated in catastrophe-prone areas. The data in Table 5 and Figure 1 are inconsistent with this claim. If LPI exposures were concentrated in catastrophe-prone areas, then LPI loss ratios would be increase more during years with major catastrophe events and be higher than homeowners loss ratios in those years. In fact, LPI loss ratios remain low during years in which homeowners loss ratios spike because of catastrophe events.

### 10.1   REO vs. non-REO Experience

When a loan goes into default and the property is foreclosed, the property becomes owned by the bank or investor and is referred to as Real Estate Owned or REO. When a property becomes REO, there is no longer a borrower involved. The REO property typically continues to be serviced by mortgage servicer on behalf of the property owner (investor) and LPI remains on that property.

It is reasonable to expect that LPI claim costs per unit of exposure are higher on REO properties than on non-REO properties because the properties are more likely to be vacant and more likely to be neighborhoods ravaged by foreclosures. If this is the case, the claims experience for LPI coverage for REO and non-REO should be evaluated separately with lower rates for the non-REO LPI coverage charged to borrowers than the LPI rates charged to servicers only for REO LPI coverage. Borrowers should not be paying inflated LPI rates to subsidize coverage for REO properties owned by the servicer or investors.

### 10.2   LPI Premiums Could Reasonably Be the Same or Less than Homeowners Premiums for the Same Property

Even if we assume that LPI claims are more frequent than homeowners claims, the lesser coverage and higher reasonable loss ratios for LPI than for homeowners could produce a lower LPI premium than homeowners premium for the same property. Table 10 starts with a homeowners premium of $1X. With an expected loss ratio of 65%, the expected claims on this coverage are 0.65X. If we assume that LPI claims are 1.5 times more frequent than homeowners claims and that the lesser LPI coverage is 80% of homeowners coverage, the expected LPI claims on this property are .65X * 1..5* 0.8 which equals 0.78X. With an expected loss ratio of 80%, the indicated premium for this property is 0.98X or slightly less than the homeowners premium for the property.

Testimony of Birny Birnbaum on behalf of the Center for Economic Justice
Public Hearing on Force-Placed Insurance before the New York Department of Financial Services
May 21, 2012

### Table 10
### LPI versus Homeowners Premium for Same Property

| 1 | Homeowners Premium | 1X |
|---|---|---|
| 2 | Expected HO Loss Ratio | 0.65 |
| 3 | Expected HO Claims (2 * 3) | 0.65X |
| 4 | LPI Coverage / HO Coverage | 80% |
| 5 | Higher LPI Pure Premium | 150% |
| 6 | LPI Expected Claims (3 * 4 * 5) | 0.78X |
| 7 | Expected LPI Loss Ratio | .8 |
| 8 | LPI Premium (6 / 7) | 0.98X |

11. **Insurer Excuses for Maintaining Excessive Rates Are Unsupported By Any Evidence and Without Merit**

During this hearing, servicers and LPI insurers have offered excuses for their failure to lower LPI rates despite actual loss ratios less than half of the expected loss ratios presented in rate filings to the Department. These explanations are illogical, unsupported by empirical evidence and without merit.

*11.1  "LPI is subject to catastrophes"*

Servicer and LPI insurer witnesses in this hearing argued that LPI is subject to massive low-frequency, high-severity catastrophe losses and such risk requires low loss ratios. This argument is contradicted by several facts. First, Table 5 and Figure 1 show that LPI loss ratios have not been impacted by catastrophe events in the same manner as homeowners loss ratios. The explanation for this may be the specific coverage excluded from LPI but present in homeowners or the actual distribution of LPI exposures.