

# Consumer Federation of America
1620 I Street, N.W., Suite 200 * Washington, DC 20006

### TESTIMONY OF
### J. ROBERT HUNTER[1], DIRECTOR OF INSURANCE
### BEFORE THE NEW YORK DEPARTMENT OF FINANCIAL SERVICES
### ON FORCE-PLACED INSURANCE IN NEW YORK
### MAY 17, 2012

Mr. Superintendent and members of the Department, I appreciate the opportunity to speak to you this morning. The work you are undertaking to uncover the abuses in force-placed insurance (FPI) is of vital importance to New Yorkers, many of whom are being harmed today. Your hearing also offers hope to consumers who have paid excessive rates for force-placed coverage across America.

## Background

Force-placed insurance (FPI) is an insurance policy placed by a lending institution on a borrower's property, when a borrower does not keep his or her hazard insurance in force. The lender is typically the named insured party. The borrower also usually listed as an "insured" on a force-ordered (FO) policy. The majority of FPI policies are issued when the borrower loses normal insurance due to non-payment of premium.

Lenders use FO insurance to assure continuous coverage on properties. In some instances, lenders use FO insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or brokers or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost services from affiliated service providers.

Because of the recent tough economic and housing situation, many more policies have become force-placed. For instance, according to data American Security Insurance Company[2] (ASIC) supplied for this hearing, they track 1,502,567 loans in New York, of which 33,287 are force-placed. The use of FPI in New York grew by 66 percent from the fourth quarter of 2006 to the third quarter of 2011, from 1.3 percent of loans to 2.2 percent.

---

[1] Mr. Hunter formerly served as Federal Insurance Administrator under Presidents Ford and Carter and as Texas Insurance Commissioner. He is an actuary, a Fellow in the Casualty Actuarial Society and member of the American Academy of Actuaries.
[2] ASIC is a division of Assurant.

PLAINTIFF'S EXHIBIT 7

A major problem with the use of FPI insurance is "reverse competition." Reverse competition is a market structure in which insurers compete for the lenders' business by providing financial considerations to the lender, including commissions, subsidized services, and other things of value. These expenses are included in the premiums charged to borrowers, which significantly drives up the price. In other words, reverse competition is a market condition that drives up prices to the consumers, as opposed to normal competition, which drives down prices to consumers. Market forces do not discipline insurers to remove unreasonable expenses when reverse competition exists.

Normal competition exists when the purchaser of insurance is the insured party who pays for the coverage. He or she therefore shops for the lowest possible price. The competition is reversed when the "buyer" (lender) is not the ultimate payer of the premium but, instead, has a financial interest in the insurance through commissions or other financial benefits. In this case, the lender, who is not the ultimate payer, has an incentive to seek higher cost insurers that offer bigger kickbacks and benefits, rather than the lowest cost option. This financial incentive may explain why low-cost options for force-ordered borrowers -- such as establishing an escrow account and paying the voluntary premium, in the case of non-escrowed insureds being terminated for non-payment -- do not appear to be a high priority for lenders.

### FPI Rates are Excessive

Reverse competition manifests itself in FPI through the payment of commissions to agents or brokers affiliated with the lender or servicer, the provision of below-cost or free tracking services provided by the FPI insurer to the lender, and through FPI carriers that reinsure FPI insurance (either in whole or in part) with captive reinsurers owned by lenders. Thus, FPI rates are much higher than normal insurance rates.

Data demonstrating the excessiveness of FPI prices is shown in Appendices 1 and 2. Appendix 1 is a detailed review I made of the rate filings of the two leading FPI insurers, American Security (ASIC) and QBE First. The rate filings show no competition in rates. Indeed QBE has adopted the same rates that ASIC received approval for in 1996 (flood) and 1997 (dwelling fire.) Neither insurer undertook anything near a full-fledged actuarial analysis of the rates they proposed to use. Appendix 2 shows data for ASIC and Balboa, the largest FPI insurer, which is owned by QBE.[3]

Both companies predicted expected loss ratios that were fairly reasonable. (An "expected loss ratio" is the percentage of each premium dollar that an insurer expects to pay out in claims under the rates they are proposing.) But these relatively high expected loss ratios were a deception, allowing the insurers to charge far more for the coverage than they should have. Here

---

[3] Best's Aggregates and Averages has only very limited data on QBE Insurance Company. Best's cites only $7,800 in national dwelling fire written premiums in 2010, with a surprising loss ratio of negative 27.6 percent and commissions of 25.3 percent of written premium. Best's also has 2005-2010 data for QBE Insurance Co. in allied lines, which had an average written premium of about $11 million and an average loss ratio of 25.5 percent over the six-year period. Commissions in allied lines averaged 14 percent but the 2010 commission jumped to over 40 percent.

2

is a comparison of the expected loss ratios ASIC filed with the actual loss ratios ASIC reported to New York that the company has actually experienced in the state over the last 12 years:

| Insurer | Expected Loss Ratio | Actual NY Loss Ratio[4] |
|---|---|---|
| ASIC – Dwelling Fire | 58.1% | 28.5% |
| ASIC – Flood | 60.0% | 17.8% |

Note: See footnote 3 for limited information from QBE Insurance Company, which shows that the 55.0 percent expected loss ratio used in their filing was not realistic.

The sale of FPI in New York seems limited to two major carriers using the same pricing structure – a very concentrated market. However, even if the market were more competitively structured, borrowers who ultimately purchase FPI coverage would be at a major disadvantage because reverse competition controls the market, leading to excessive prices.

### New York is Uniquely Positioned to Lead the Nation on FPI Reform

Reverse competition abuses fall into the cracks between insurance and banking regulation. Looked at purely from the typical insurance regulator's perspective over recent decades, FPI is commercial insurance between a sophisticated seller (the FPI insurance company) and a sophisticated buyer (the lender or servicer.) In addition, the expenses that occur because of reverse competition may be unjustifiably high, but they are real. Commissions really are paid to agents, below-cost tracking costs can be documented and reinsurance arrangements with lender affiliates do exist.

Insurance regulators look at these facts and approve the rates to be charged *to the lender*. However, until recently, insurance regulators didn't do more than a superficial analysis to see where those expenses were flowing. If they did, they would uncover a hidden rebate to the named insured party, such as a lender. Overt rebates are illegal in almost every state.

Further, insurance regulators did not look beyond the insurer/buyer transaction to assess the impact on others who might be actually paying the bill, such as the borrowers who pay for FPI. This lack of attention to consumer impact is also true for automobile FPI, title insurance and various forms of credit insurance, where reverse competition is rampant. Individual consumers are significantly harmed by these cozy reverse competition arrangements.

Banking regulators appear to have done little to control these abuses either. They often see this as an insurance issue; in other words, somebody else's problem. Besides, what could be better for safety and soundness than the huge profits FPI generates?

New York's holistic financial services regulatory structure holds the key to reform. Because the Financial Services Department oversees both insurance and banking, the state is uniquely suited to investigating "gap abuses" that inhabit the space between insurance and

---

[4] See Page 2 of Appendix 2 for data supplied by ASIC upon which these loss ratios are based.

3

lending regulation. The nation is looking to New York for leadership on this critical matter. Consumers need your help!

<u>Insurer/Servicer Explanations for High Rates are not Valid</u>

Insurers have justified excessive FPI rates on two basic grounds:

1. Insurers do not underwrite FPI, and, therefore, cannot adequately consider the insurance risk of each borrower, and

2. Insurance departments approve all FPI rates.

Data demonstrates that the lack of underwriting only explains, at most, a small fraction of the higher FPI prices. Some borrowers do not have home insurance – and must be force placed – because they are higher risk and cannot get the coverage. However, most of the higher price charged for FPI is because of non-payment of premium, not higher insurance risk.

Consider this chart showing how each premium dollar for FPI and normal home insurance is allocated:



Data underlying this chart are shown in Appendix 2. "HO" is Homeowners Insurance.

Note that the loss ratios (the part of the dollar used up by losses) are much lower for Balboa and American Security, which sell FPI, than for the home insurance industry overall. If an insured can't pay his or her homeowner's insurance premium and is thus force-placed, the expected payouts in losses per-dollar-of-premium drops sharply from 62.7 percent for the average industry homeowners' policy to 24.0 percent for American Security and 18.3 percent for Balboa.

Hypothetically, if a homeowner being force-placed were paying a rate of $1,000 for the average industry homeowners' policy, the insured's expected losses would be $627.00. Compare that figure to the much lower losses experience by FPI insurers. If both FPI carriers

4

charged $2,000 for the new policy the borrower is forced into, the expected payouts would be $366 for American Security and $480 for Balboa, much less than was paid out under the homeowners policy. If the premium was $3,000, the figures would be $549 and $720 respectively.

Lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance. For this and other reasons, it is unclear if overall FPI rates should legitimately be much different than normal rates, when adjusted to use proper commissions (if any at all are justified), to remove unjustified tracking costs from pricing and to eliminate profit kickbacks through captive reinsurance arrangements. I expect it they would be only marginally higher if they were properly priced.

Approval of rates charged by a FPI insurer to lenders by New York should not be seen as approval of what lenders can charge borrowers. This is because borrowers should not have to pay for expenses that are not related to the insurance risk being covered for that individual. For example, the 2 percent of borrowers who are force-placed pay all or much of the cost of tracking 100 percent of the portfolio of lender loans, including escrowed loans that will not be force-placed for non-payment. Further, expenses that are clearly excessive, such as the commissions paid for many force-placed policies, should be controlled. Likewise excessive profits for bank-affiliated reinsurers should be eliminated. In other words, FPI profits flowing to the lender should be excluded from the price charged to the borrowers for FPI. The amount a borrower pays for FPI should be only that which is reasonably necessary to cover the risk, expenses and profit of that individual's insurance.

**Suggestions for Reform**

*Use escrow to keep voluntary coverage in place.* In cases of non-payment leading to a need for coverage to protect the collateral, lenders should use the escrow (or set up escrow if it is not in place) to pay the original carrier and thus continue the voluntary policy in force.

*Eliminate or substantially reduce kickbacks.* I recommend requiring a minimum loss ratio (MLR) as the best way to control the adverse consequences to consumers of reverse competition. However, to be meaningful, the MLR must be vigorously enforced. The loss ratios that insurers claimed they would meet in New York rate filings were never realized. Indeed, as demonstrated above, the actual loss ratio results were often less than half of what the insurers said they would be (see Appendix 1).

Commissions to lender-affiliated agents or brokers are problematic and appear to be falling out of use, as some lenders have recently eliminated them. There is little for an agent or broker to do in a force-placed situation and little need for commissions. Realistically, a fair commission for FPI insurance is well under 2 percent, using industry norms and considering the higher price of FPI. Even if FPI rates come down to the proper level -- a fraction of today's rates -- it is unlikely that the fair commission rate would reach 5 percent of premiums. Other acquisition and general expenses should also be minimal; perhaps another 5 percent when

5

tracking costs are not included.[5] A minimum loss ratio of no less than 80 percent seems reasonable as an enforceable standard, in order to remove the adverse effects of reverse competition from FPI insurance.

The alternative approach is to allow only reasonable expenses associated with the provision of FPI insurance and prohibit expenses associated with servicing and profits that flow to lenders. Given the existence of reverse competition and the history of low loss ratios and inflated expenses, the burden should be on insurers to demonstrate the legitimacy and reasonableness of expenses, not just the fact that they incurred them. However, this standard is much more difficult to enforce than a MLR, since it requires regulators to continually dig beneath expenses and profits to find out where these dollars are flowing. It is possible to do, but very complex. Moreover, it is not a very effective way of countering the reverse competition dynamic that is prevalent in this market place.

If a MLR is not adopted and enforced, then I urge the department to demand <u>immediate rate filings</u> for all FPI insurance rates and do a complete statistical and actuarial analysis of these filings. Your market conduct examiners, actuaries and other experts will have to, for the first time, delve beneath the surface of expenses and affiliate arrangements, such as reinsurance, to determine fair levels of expenses and profits and root out the vestiges of reverse competition abuses.

Finally, on behalf of millions of consumers around the nation who are being harmed today by unfair and excessive insurance rates, I urge you to use the results of your investigation of FPI abuses to <u>expand the scope of your reform efforts</u> to examine other types of insurance where reverse competition abuses are also rampant, such as auto FPI, credit insurance, debt cancellation products and title insurance.

Conclusion

Mr. Superintendent, I congratulate you and the department for your groundbreaking work to highlight and reform abusive FPI practices that harm millions of consumers. Your hard work is overcoming decades of neglect regarding the plight of the borrowers who are force-placed in New York. Your actions in this matter will set the stage for reform not only here in the Empire State but across the nation.

I would be happy to answer any questions you might have.

Appendices

1. Analysis of current FPI rate filings by American Security (Assurant) and QBE First in New York.
2. Insurance statistics for FPI and voluntary home insurance for the last decade.
3. Items of interest from testimony of insurers and servicers.
4. Responses to NY DFS questions 1 to 4, if not covered in the body of the testimony.

---

[5] Appendix 3 shows that ASIC puts tracking costs in other acquisition expense; other insurers seem to also put these expenses in general expense where the expense ratio for that item can exceed 30 percent.

APPENDIX 1

# REVIEW OF RATE FILINGS JUSTIFYING THE CURRENT FORCE-PLACED INSURANCE RATES OF AMERICAN SECURITY INSURANCE COMPANY AND QBE FIRST INSURANCE COMPANY

## American Security Insurance Company (ASIC) Dwelling Fire

The rates were filed in 1997 and are still in use, producing a loss ratio in New York of 24.6 percent over the last decade, according to data in the company's Annual Statements, and of 28.5 percent from 2000 through 2011, according to information ASIC filed for this hearing. (See Appendix 2.) The rates have consistently been excessive, yet they have not changed for 15 years.

The filing claims that the Permissible Loss Ratio expected under the 1997 rates was 58.1 percent. Obviously, the company has not come close to achieving this loss ratio. Here is a breakdown of the how ASIC has allocated each premium dollar over the last decade in New York, compared with what they predicted:

| Item | Filing | Actual |
|---|---|---|
| Loss Ratio | 58.1% | 24.6% |
| LAE | Incl. | 3.5 |
| Commissions | 25.0 | 12.6 |
| Other acquisition | 3.5 | 2.5 |
| General | 8.8 | 23.7 |
| Taxes | 2.6 | 2.6 |
| Profit | 3.0* | 30.6 |

*After inclusion of investment income.

The rates filed were $1.20 per $100 of dwelling coverage and $2.00 per $100 for mobile homes. (Base deductibles were $100 at the 1.00 factor. $250 was a factor of .875, $500 = .80 and $1,000 = .70.) Although the rates were approved, no real actuarial analysis of the rates was conducted. The company has not filed new rates or analyses since 1997.

7

### American Security Insurance Company (ASIC) – Flood

The flood insurance filing was made in 1996. From 2000 to 2011, the loss ratio was 17.8 percent. This included large flood losses in 2011, presumably from Hurricane Irene. Even so, the loss ratio is well below the Permissible Loss Ratio in the 1996 filing (60.0%). Here is a breakdown of how each premium dollar was allocated in the filing[6] compared with the loss ratio actually achieved:

| Item | Filing | Actual Loss Ratio |
|---|---|---|
| Loss Ratio | 60.0% | 48.7% |
| LAE | 1.3 | |
| Commissions | 0.0* | |
| Other acquisition | 3.5 | |
| General | 28.7 | |
| Taxes | 1.5 | |
| Profit | 5.0 | |

*The filing says "we do not pay commissions on this program."

The proposed rates for residential coverage were $0.90 per $100 of flood coverage except in flood-prone V Zones, where the rate was $3.00. Deductible = $750.00.

Tillinghast did a non-actuarial analysis of the NFIP prices, using no loss and expense data from the company and just looking at the NFIP rates alone to propose a rate for dwelling of $0.80. However, ASIC rates proposed by the insurer were and remain ten cents higher than that: $0.90. Tillinghast did point out that NFIP used a deductible discount of 25 to 30 percent for a $5,000 deductible, with lesser discounts for lower deductibles.

### QBE Insurance Corp – Dwelling Fire

QBE filed "me too" rates in 2009, copying the rates of Empire Fire and Marine. I understand from the New York DFS that Empire's rates were also a "me too" filing, copying ASIC. So, for all intents and purposes, there is no rate competition between the leading FPI providers, although both companies have filed Schedule Rating plans where the lenders and insurers can negotiate rates up or down by up to 15 percent without insurance regulatory approval. These Schedule Rating Plans allow the insurer to charge different prices to lenders based on very loose criteria, such as who tracks the loans, average home insured value, (higher values get a discount) who originated the loans and expense differences. Competition does not exist in pricing, at least regarding prices filed with New York State. The competition is focused on kickbacks to the lenders, which drives up the rates paid by borrowers.

---

[6] I have seen no data on expenses under the flood program.

8

The QBE filing contains no insurance experience, ike claims and expense information. QBE charges $1.20 per $100 for hazard insurance, the same as Empire and ASIC. QBE does allow deductibles of up to $10,000, with a factor of .33 percent for that deductible, which represents a 67 percent discount.

QBE Insurance Corp – Flood

QBE filed rates in 2009. It also was a "me too" filing copying the rates of Empire Fire and Marine (and, thus, ASIC since I understand from the New York DFS that Empire also did a "me too" filing, copying ASIC.) The residential flood rate is $0.90 per $100 of value, the same as ASIC. QBE offers bigger deductibles than ASIC, up to $5,000, for which the factor to be applied to the base rate is 0.71, a discount of 29 percent. Additional "costs of compliance" coverage – such as having to elevate the first floor of the home to meet flood zoning requirements after a home is 50 percent damaged, which is a FEMA flood insurance requirement – costs $0.05 per hundred, a total of $0.95 per $100 of home valuation for full coverage. The Schedule Rating Plan is also available for flood coverage.

Permissible Loss Ratios

The filings by QBE were made in 2009. There are no data or actuarial analysis from QBE. The filing had a premium allocation breakdown of:

|  | Filing Proposed | 2005-2007 Data in Filing Used to "support" the selected Provisions | Balboa Dwelling Fire Actual L/R |
|---|---|---|---|
| Loss Ratio | 55.0%* | Not Shown | 18.3% |
| Commissions | 27.5 | 13.2% |  |
| Other acquisition | 5.0 | 6.0 |  |
| General | 4.5 | 4.5 |  |
| Taxes | 3.0 | 10.8 |  |
| Investment Income | 0.0 | 0.0 |  |
| Profit | 5.0 | Not Shown |  |

Note: The source for the expense data is not disclosed in the filing. It is not clear exactly what expense data are shown here. Presumably, it is QBE data but it is unclear what lines of insurance the filing refers to. Obviously, the expected loss ratio produced using these data had no relation to the actual loss ratio. In 2010, the only year of data for QBE Insurance Company in Best's Aggregates and Averages for dwelling fire, the loss ratio was actually negative, minus) 27.6 percent. The flood loss ratio in 2010 (also the only year in Best's) was 32.0 percent and the six-year average loss ratio (2005-2010) for Allied lines was 25.5 percent. The 55.0 percent Expected Loss Ration was obviously not anywhere close to being a legitimate projection.

* In accordance with form CRDPRP. The adoption of this 55.0 percent expected loss ratio by QEB seems a pro forma step simply to comply with the requirements of the form. It s not verified by data in the filing nor achieved in practice.

9

Comment

Not a single insurer providing FPI appears to have ever provided the state with an actuarially based filing, using real data. ASIC filed for excessive rates (as their loss ratios prove) 15 years ago. Other insurers simply adopted the same excessive rating structure. No justification for these prices has ever been presented to the New York Insurance Department, to my knowledge. Worse, other FPI carriers have adopted ASICs pricing scheme, with no real actuarial analysis, including QBE, as late as 2009. The lack of review and updated information based on experience is very troubling and has cost New York consumers dearly.

Even if the prices were established based on a real actuarial study, the end result of what is charged to borrowers would not necessarily be different. This is because the insurers both have an extensive Schedule Rating Plan that allows the insurer and lender great flexibility to negotiate any rate they want within a range of plus and minus 15 percent. The problem is the people not at the negotiating table – borrowers – pay the premium that is being negotiated. The negotiators can both gain by selecting high prices to the detriment of borrowers.

10

APPENDIX 2

| | FIRE INDUSTRY | FIRE BALBOA | FIRE AMER. SEC |
|---|---|---|---|
| Loss Ratio (EP) | 44.9% | 18.3% | 24.0% |
| LAE Ratio (EP) | 5.5% | 2.2% | 2.8% |
| Commission Ratio (WP) | 12.7% | 9.0% | 11.1% |
| Other Und Expense (WP) | 14.0% | 14.8% | 29.0% |
| Profit | 22.9% | 55.7% | 33.1% |
| Total | 100.0% | 100.0% | 100.0% |

| | ALLIED INDUSTRY | ALLIED BALBOA | ALLIED AMER SEC | HOMEOWNERS INDUSTRY |
|---|---|---|---|---|
| Loss Ratio (EP) | 76.7% | 39.1% | 43.1% | 62.7% |
| LAE Ratio (EP) | 7.9% | 8.9% | 3.5% | 10.0% |
| Commission Ratio (WP) | 12.4% | 7.8% | 9.3% | 13.8% |
| Other Und Expense (WP) | 13.7% | 14.7% | 33.8% | 14.3% |
| Profit | -10.7% | 29.5% | 10.3% | -0.8% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

New York 2000-2012 loss ratios: ASIC fire and allied lines = 28.5% (See next page of this Appendix); 2002-2011 Best's data for Balboa fire = 33.0%; allied lines = 54.9%

Sources: 2001-2010 Industry National Data from Best's Aggregates and Averages, 2011 Edition. American Security and Balboa: 2002 to 2011 national data from Statutory Page 14 of the Annual Statements of the insurer for loss ratios, Commissions and taxes. Other expenses from Best's Aggregates and Averages, taken from multiple editions.



11

American Security Insurance Company

**Program:** Residential Mortgage Service Program
**Policy Form:** MSP-RES-INV-2

| Calendar Year | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|
| 2000 | 13,766,690 | 4,998,891 | 36.3% |
| 2001 | 16,178,238 | 5,889,453 | 36.4% |
| 2002 | 17,161,415 | 7,138,754 | 41.6% |
| 2003 | 20,375,954 | 7,748,193 | 38.0% |
| 2004 | 21,392,323 | 7,242,182 | 33.9% |
| 2005 | 23,607,808 | 5,194,734 | 22.0% |
| 2006 | 31,942,923 | 7,889,496 | 24.7% |
| 2007 | 48,034,529 | 9,307,311 | 19.4% |
| 2008 | 65,321,418 | 11,300,777 | 17.3% |
| 2009 | 77,002,025 | 17,577,492 | 22.8% |
| 2010 | 85,086,530 | 20,676,696 | 24.3% |
| 2011 | 97,556,093 | 24,073,540 | 24.7% |

The above 12 years of NY dwelling fire data averages 28.5%
USA Loss Ratio 2001 – 2011 averages 31.1% for dwelling fire

**Program:** Residential & Commercial Flood Program
**Policy Form:** MSP-R-INV-FL

| Calendar Year | Earned Premium | Incurred Losses | Loss Ratio |
|---|---|---|---|
| 2000 | 590,417 | 1,653 | 0.3% |
| 2001 | 698,476 | 22,267 | 3.2% |
| 2002 | 751,906 | 10,207 | 1.4% |
| 2003 | 907,526 | 15,953 | 1.8% |
| 2004 | 1,362,500 | 69,354 | 5.1% |
| 2005 | 1,684,339 | 209,994 | 12.5% |
| 2006 | 1,940,350 | 619,741 | 31.9% |
| 2007 | 2,825,337 | 325,872 | 11.5% |
| 2008 | 4,958,451 | 153,166 | 3.1% |
| 2009 | 5,314,100 | 66,463 | 1.3% |
| 2010 | 9,526,858 | 478,272 | 5.0% |
| 2011 | 9,460,139 | 12,884,099 | 136.2% |

The above 12 years of NY flood data averages 17.8% (No national data available)

12

APPENDIX 3

## ITEMS OF SPECIAL INTEREST FROM OTHER TESTIMONY

### Chase Insurance Agency (CIA) & Banc One Insurance Company

Claims higher costs are due to lack of underwriting.

In 2005, Assurant was selected as sole provider of FPI for Chase/Banc One. It also does the tracking of insurance.

Assurant cedes quota share reinsurance on the FPI account to Banc One. 75 percent of the risk goes to Banc One, along with 75 percent of the premium, less an 18 percent ceding fee.

Until recently Chase Agency received a commission on flood and wind policies (20 percent flood – lowered to 10 percent in 2010, 4 percent wind). No commissions are received today, a recent change.

Interestingly, Chase says, "the premium rate paid by borrowers for LPI (FPI) policies...was the same, regardless of whether CIA received a commission." By eliminating the commission, Banc One apparently still gets 75 percent of what would have been commission, but now is profit flowing from the reinsurance arrangement.

Only 1.3 percent of borrowers are force-placed. Since tracking seems at least partially paid for in premiums at Assurant, (see page 10 of Assurant testimony in this matter) 1.3 percent of the borrowers pay 100 percent of that part of the tracking cost.

70 percent of loans use escrow.

### American Security Insurance Company (ASIC – part of Assurant)

2 percent of loans are FPI, a "significant increase" due to recent economic conditions. According to data ASIC supplied in a spreadsheet, they track 1,502,567 loans in New York of which 33,287 are force-placed. In the fourth quarter of 2006, 1.3 percent of loans were FPI, in the third quarter of 2011, 2.2 percent were, a growth of 66 percent.

The huge growth in the insurer's FPI business is not limited to New York. According to a Delaware Market Conduct Examination, as of December 2008, "Assets of the Company increased 126% from 2005 to 2008; premiums increased 158%; and net income increased 239%. Surplus as Regards Policyholders increased 194% during this examination period."

The data supplied by ASIC also showed experience from 2000 through 2011, where the overall loss ratio in New York was 28.5 percent. Data from 2006 through 2011 showed commissions were averaging 9.5 percent, other underwriting expenses (including any tracking cost) was 32.5 percent (exceeding losses!) and profit was 34.8 percent (also exceeding losses!) The loss ratio

13

breakdown during 2006 - 2011 was hazard insurance loss ratio = 25.1 percent, flood = 48.7 percent and wind = 5.0 percent (wind has very limited experience since 2010).

Assurant claims that higher cost of FPI policies is due to lack of underwriting.

Assurant also says New York approved the rates it uses.

Assurant claims that New York loss ratios are low because of growth and no weather catastrophes in New York.

Assurant claims to pay commissions "comparable to those in the standard market." (It does not, however, discuss the much different workload for the agents of the two markets. Agents normally spend a lot of money securing and retaining clients for voluntary home insurance. FPI agents receive clients automatically/electronically).

Tracking costs are described by ASIC in their testimony at Page 10 as follows:

"'Other acquisition expenses' are expenses of acquiring business other than commissions and expense reimbursements. Costs associated with mailings to prospective insureds and salaries of employees who do not work on a commission basis are included in this category. For ASIC, this category includes the cost of exposure tracking, processing and activities to monitor insurance coverage, which are prerequisites for lender-placed insurance."

Regarding captive reinsurance, another way to share profits with lenders and servicers, ASIC says (page 11):

"ASIC has reinsurance agreements with certain property and casualty reinsurance companies affiliated with our mortgage servicer clients. All of ASIC's current reinsurance agreements with such entities are on a quota share basis. In other words, the servicer-affiliated reinsurers share in the premiums earned and proportionally in the losses that arise from the policies on which the premiums were paid. ASIC also requires these reinsurers to have adequate capital or to post collateral, such as funds withheld or letters of credit."

### GMAC Mortgage

Has used QBE First since 2003 "as the exclusive" FPI insurer (became QBE when Balboa acquired by QBE from Bank of America). QBE also does the tracking.

GMAC does not receive commissions and has no reinsurance arrangement with QBE.

### Select Portfolio Servicing, Inc., Pelatis Insurance Agency Corp. and Pelatis Limited Insurance

SBS uses Assurant for tracking and FPI.

14

Pelatis Agency did get 15 percent commissions until December 15, 2011. No longer accepts commissions.

Pelatis Insurance (Bermuda) is the reinsurer under a quota-share arrangement with Assurant. The details of the deal are not disclosed in the testimony. Nor was it disclosed if the rates were changed when the commissions were eliminated. I assume not, since I expect that would have been made clear in their testimony. If the rates did not change, by eliminating the commission, Pelatis still gets a large part (based on the quota-share percentage) of what would have been commission but now is profit flowing from the reinsurance arrangement.

### American Home Mortgage Servicing, Inc. and AHMSI Insurance Agency, Inc. (AHMSI)

Uses QBE First for FPI and tracking. Pays 8¢ per loan per month for tracking (note: this is likely not the full cost of tracking). The agent gets commissions of 15 percent.

AHMSI got a "one-time marketing services payment from QBE First" upon entering into the exclusive contract in 2008. At the time they did the deal they did it with ZC Sterling, which later became QBE through acquisition. AHMSI shareholders also got "warrants giving them the right to purchase up to 15% of the fully diluted common shares of what had been ZC Sterling." When QBE acquired ZC Sterling, "the warrants held by AHMSI's shareholders were converted...to receive cash consideration."

Says New York approved the rates it uses.

AMHSI has no reinsurance deal at play here.

15

APPENDIX 4

## NYDFS QUESTIONS 1 – 4: DISCUSSION

The New York Department of Financial Services posed six questions to those invited to testify. I have commented on some aspects of the first four questions throughout my testimony. The questions the Department posed are:

1. How are rates and expected loss ratio for force-placed insurance policies are calculated?

2. What are expenses relating to force-placed insurance?

3. What is the purpose of payment of insurance commissions to banks, mortgage servicers or their affiliates relating to force placed insurance?

4. How is reinsurance ceded to an affiliate of a bank or mortgage servicer?

What follows are short answers to these questions; greater detail is found in the body of the testimony.

**Response to Q 1:**

Expected loss ratios, also called "permissible loss ratios" in the documents I reviewed, are used in the filings of ASIC and QBE. They are not important for FPI in New York and are irrelevant to the actual results of the insurers. The insurers have not done real actuarial analyses of these products in the filings. Rates utilized by both American Security and QBE are based on American Security's filings from 1996 and 1997. There is no competition in pricing.

Even if the prices were based on genuine actuarial study, the use of extremely flexible Schedule Rating Plans by both companies allows lender and insurers to negotiate almost any rates they want -- within 15 percent up or down -- from the rates proposed in the filings. The borrower who ultimately pays the FPI premium has no say in how Schedule Rating might be used in setting the price.

**Response to Q 2:**

As I demonstrate in the testimony and exhibits, the FPI expenses are often greater than the claims' payouts to borrowers and/or FPI profits of are larger than the payouts. American Security (Assurant) has higher expense ratios than Balboa (QBE) but higher profits. I believe this is likely because Balboa was owned by Bank of America, its largest client. As a result, kickbacks like commissions and below-cost tracking are unnecessary, in that the profits flowed directly to the lender's affiliated insurance company.

16

**Response to Q 3:**

Commissions appear to be a disappearing element in FPI, at least for those lenders that have a captive reinsurer in place to capture the dollars in a more subtle way.

Normal (or even super-normal) commissions never made much sense. FPI agents have nowhere near the same workload as normal agents because of the much different workload for the agents in the two markets. (Agents normally spend a lot of time and money securing and retaining clients for voluntary home coverage; FPI agents receive clients automatically from the insurance tracking mechanism of the servicer or insurer). If commissions are paid to FPI agents, they should be a small fraction of normal commissions.

Finally, even if the FPI agent did the same amount of work and deserved the same commission, the commission percentage should not be the same as in the normal market. If an agent's effort was worth $100 a policy for homeowners insurance and the insurer's average homeowners' insurance premium was $1,000, the insurer would pay a 10 percent commission to produce the proper dollar commission. If that same home were force-ordered, the premium would jump markedly, typically to double the premium or much more than that. Assume the new FPI premium was $3,000. A 10 percent commission would produce $300 – three times what the "voluntary" market was paying for such work. Much higher commissions for much less work can only exist when reverse competition is at play.

Even if reforms lower FPI insurance rates to near-normal pricing, the commission percentage in rates should be much less -- as low as zero -- because the workload of any FPI agent or broker is much less, as low as no work load.

**Response to Q 4:**

Ceding of reinsurance to an affiliate of the lender or servicer often appears to be done as a way to direct profits back to the lender, because a more honest and transparent, straight rebate is not allowed by state law. A combination of excessive rates and using a licensed insurer as a fronting operation to get the premium dollars back to the lender or servicers is a classic reverse competition arrangement that presents difficult regulatory issues, as reinsurance is essentially unregulated in places that host these captives, like Vermont or Bermuda.

17