AMERICAN BANKER

# Ties to Insurers Could Land Mortgage Servicers in More Trouble

By Jeff Horwitz
NOV 9, 2010 12:00pm EDT

**Correction:** *An earlier version of this story incorrectly stated that Bank of America did not comment for the record. The bank's comment is now included.*

**When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.**

Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

"There's no arm's-length transaction here, and that creates all sorts of incentives for the servicer to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit," said Diane Thompson, of counsel for the National Consumer Law Center. "Servicers and insurers have turned this into a gravy train."

Sometimes the arrangements resemble simple kickbacks: Court documents show that a subsidiary of the country's largest specialty insurer paid undisclosed "commissions" for the rights to a servicer's force-placed business.

State court filings show alleged abuse in which banks charged borrowers for unnecessary insurance and backdated policies providing coverage retroactively. Often the insurance was acquired only after banks stopped advancing the premiums of delinquent borrowers' escrowed policies, causing those cheaper and more comprehensive policies to expire. In response to questions from American Banker, federal and state officials said that some practices that industry trade groups defend may not be legal.

PLAINTIFF'S EXHIBIT
12
tabbies

"It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed," said Brian Sullivan, spokesman for the Department of Housing and Urban Development. Foreclosure defense and legal aid attorneys say force-placed insurance is found on most of the severely delinquent loans in this country. If so, the cost to investors may well be in the billions of dollars.

"This is clearly not in the investors' interest," said Amherst Securities analyst Laurie Goodman, who in May noted the potential for misconduct with Bank of America's force-placed-insurer subsidiary, Balboa Insurance Group. "Servicers are getting a huge chunk of money from force-placed insurance, and investors pay for it by higher loss severity at the liquidation of the loan."

With little regulatory oversight or even private investor awareness, force-placed insurance has helped make drawn-out foreclosures lucrative for servicers — far more so, in some cases, than helping a borrower return to performing status. As the intermediary between borrower and investor, servicers appear to be benefiting themselves at the expense of both.

**Backdated Coverage**
When attorney Jeffrey Golant took on his first forced-placement case, he thought he was looking at an administrative mistake.

A solo practitioner in Pompano Beach, Fla., Golant splits his time between foreclosure defense and insurance cases. He had been referred his first forced-placement case by his mother, Margery Golant — also a longtime foreclosure defense attorney — in May of 2008 when the dispute veered into insurance territory.

The problems should have been quick to sort out, Golant recalls. His client was current on her mortgage and claimed the lapse of insurance coverage on her home was the result of her previous insurer's error. Much of the new policy's coverage was redundant, Golant said, duplicating flood and wind policies that had remained in place. Moreover, billing her for expensive retroactive hurricane protection, for a year when there had been no significant storms, struck Golant as inherently ridiculous.

"I really thought they'd added an extra digit," he said.

But the servicer that had requested the policy — nominally Zions Bancorp., though like many regional banks, the company outsources its servicing and does not involve itself in loan-level decisions — wouldn't back down. The backdating was appropriate because "Had there been damage to your property during the uninsured time ... you would have benefited significantly," the servicer said in one letter.

The Mortgage Bankers Association told American Banker that retroactive coverage is necessary to prevent gaps in insurance. But asked for an opinion on backdating a policy by nine months, the National Association of Insurance Commissioners told American Banker that insurance is "prospective in nature." Therefore, policies "should not be back-dated to collect premiums for a time period that has already passed," the trade group for state insurance regulators said.

The case got stranger when Golant's client visited the address listed for the insurer in an unsuccessful attempt to sort things out, he said. While the people there claimed to represent the servicer, they were operating out of an office belonging to a force-placed policy insurer since acquired by QBE Insurance Group.

Golant didn't understand why the insurer would be speaking on behalf of the servicer. But shortly after he began asking questions about the relationship between servicer and insurer, the case settled. Confidentially. At the insurer's request.

With the matter resolved, it would have made sense for a Florida solo practitioner who handles as many as 50 cases at any one time to move on. Golant, however, started investigating the connections between multibillion-dollar banks and specialty insurers.

"Frankly, it was their speed and willingness to settle that made me think they were not at all confident about the arrangement," Golant said. "I was still in the dark. But I got curious."

Collaborating with his mother, Golant says he began to take on more force-placed insurance cases, often agreeing to bill the borrower only if he won. Cases he pointed out to American Banker show no shortage of questionable alleged practices. In some instances, servicers force-placed insurance on borrowers in excess of their mortgage's face value and property's overall worth. (A representative of the Mortgage Bankers Association said the industry often is required to reinsure a property up to the cost of its replacement value, even if that's in excess of the mortgage.)

In other instances, servicers force-placed duplicative insurance on residents of condominium associations that insured their members' properties. In yet more, servicers had stopped advancing the premiums for a delinquent borrower's escrowed private insurance, allowing it to expire. When it did, they bought far more expensive force-placed insurance to replace it, and began advancing the premiums on that. This — a common practice, Golant says — was not just harmful to borrowers. It was inexplicable from the point of view of protecting investors.

What all the cases had in common was astronomically priced force-placed insurance, he said. There is no doubt that borrowers who aren't paying for their own insurance pose a heightened insurance risk. But servicers were billing Golant's clients for policies that cost as much as 10 times as much as the insurance they replaced. In one example confirmed by American Banker, an $80,000 property standing on a $40,000 lot was force-placed with a policy costing $10,000. Put another way, one year of insurance payments would strip away 13% of the structure's total value.

It wasn't just off-brand and subprime servicers who were tacking the high-priced policies on to borrowers' mortgage bills. It was the country's biggest banks, from JPMorgan Chase & Co. to Wachovia, now part of Wells Fargo & Co. Why did they seem so eager to purchase high-priced insurance on the homes of already struggling borrowers?

Golant got his answer in a case in which EverBank Financial Corp's servicing arm had allegedly allowed a borrower's $4,000 escrowed insurance to lapse in error and then replaced it with a policy costing more than $33,000. In response to written questions, a subsidiary of Assurant, one of the country's biggest specialty insurers, revealed that it hadn't kept all the money that EverBank's

servicing operation had paid it. Instead it immediately paid EverInsurance, the servicer's subsidiary, a $7,100 "commission" and left the door open to further compensation.

For Golant, this set off alarm bells: instead of trying to place affordable insurance on his client's home, EverBank had taken what was at minimum a $7,100 cut. That was more money than EverBank would ever collect from actually servicing the loan, and EverBank had done nothing to earn it — except let Assurant write a high-priced policy on his client's house. (According to the MBA data cited by MortgageDaily.com, servicers earned on average $51 per loan last year.)

"The 'commissions' that [Assurant] paid ... were in fact kickbacks," the attorney wrote in a complaint still being litigated. "This incentivized EverHome to select the most expensive force-placed coverage available, and to force-place insurance as frequently as possible."

EverBank is in the process of going public, and could not comment because of SEC restrictions on its public statements, a spokeswoman for the bank said. But, at least in substance, its relationship with an insurer is hardly unique. Agreements providing banks with commissions on force-placed insurance appear to be standard for many players, including one of the country's largest — Wells Fargo.

Wells declined an on-record interview for this story, though it acknowledged relationships with three force-placed insurers and provided other guidance. JPMorgan Chase did not speak on record with *American Banker*. A spokesman for Bank of America said by email it buys forced-placed insurance only "after several attempts have been made to notify borrowers that their insurance has lapsed and to remind them of their obligation to maintain continuous coverage." B of A is seeking a buyer for Balboa, which it inherited with its 2008 acquisition of Countrywide Financial Corp.

But the MBA defended commissions on force-placed business. It is common practice for an insurer to pay fees for business referrals, said Vicki Vidal, a vice president at the trade group. Asked if those commissions inflated the price that homeowners or investors ultimately paid, she said they did not.

"The rate is separate from the commission," Vidal said, adding that state insurance regulators can set limits on what premiums are allowed.

**Circular Arrangement**

Commission fees aren't the only way major servicers profit on the force-placed policies in their portfolio. Some, including JPMorgan Chase, have adopted a roughly equivalent if slightly more sophisticated method of profiting from force-placed reinsurance: They reinsure it.

Evidence of the practice comes from Assurant's Securities and Exchange Commission filings as well as the banking companies' boilerplate language for notifying borrowers of their intent to bill them for a force-placed policy.

JPMorgan Chase's force-placed insurance "will have significantly higher premiums than standard insurance premiums," the banking company noted in one letter to a borrower last year, and "Some or all of these premiums will be reinsured through an insurance company that is an affiliate of Chase."

–

JPMorgan Chase declined to specify what insurer it typically works with, but Assurant's annual report describes precisely such a relationship from an insurer's perspective. In an effort to align its interests with its servicer customers, the company will often reinsure the policies it writes with the same servicer that requested them.

"Such arrangements allow significant flexibility in structuring the sharing of risks and profits on the underlying business," Assurant notes.

The interests of the two parties are so aligned, in fact, that in many cases there ceases to be a clear difference between the entity purchasing insurance and the entity selling it.

According to both Assurant's SEC filings and the marketing materials of a subsidiary of rival QBE Insurance Group, the insurers don't just write policies on request — they also enter into long-term agreements to detect uninsured properties in their clients' servicing portfolios and perform other back-office functions. It was precisely such an arrangement that Golant's first client ran into when she tried to visit her servicer, he says — the insurance company employees had taken over the servicer's role.

Like the direct commission payments that Golant discovered, reinsurance deals cut servicers in on insurer profits. They also come with another potential advantage for the insurer: they provide an incentive for the servicer not to pursue claims, creating an apparent conflict of interest. As a representative of investors, the servicer should vigorously pursue any and all claims arising from its forcibly insured portfolio. But because the servicer reinsures the policies it purchases, any claims it brings could potentially come out of its own profits.

For insurers, opening the door to this circular arrangement has its drawbacks. Assurant warns in investor filings that having reinsuring business with the client that provided the policy, rather than a reinsurer of the company's own choosing, can pose a credit risk: the bank fails to eat its share of claims. Assurant mitigates this danger, it says, by requiring some of its client-counterparties to obtain letters of credit from other financial institutions.

The more vexing issue for Assurant, however, seems to be that giving the servicers part of the deal leaves less for the company. In a section discussing risks arising from servicer industry consolidation, Assurant warns that giant servicers are compressing margins and that it may receive a lower share of premiums if it provides them with bigger reinsurance deals.

Nonetheless, Assurant sees force-placed insurance as its future. The unit handling force-placed insurance has accounted for $811 million of its $879 million in profits during the last two years, and its "business strategy is to pursue long-term growth in creditor-placed homeowners insurance" as well as expand that business into auto insurance and related areas.

Assurant declined to be interviewed for this story, and did not address questions on conflict of interest concerns. But the company, which also provides health, corporate and other types of insurance, issued a statement defending its general force-placed business practices.

"Lender-placed insurance programs are regulated in all states and we comply with those regulations," the statement reads in part. "We believe our rates to be among the lowest in the industry."

QBE Insurance, the parent of the insurer involved in Golant's first force-placed case, did not respond to requests for comment.

The MBA's Vidal denied that reinsurance deals posed a conflict of interest, suggesting they may only cover catastrophic losses.

"Don't get the impression that everyone has reinsurance capacity," she said. "But to the extent they do, they're obviously getting paid for absorbing a portion of the risk."

**"No Incentive" To Shop**
Force-placed insurance isn't inherently objectionable. It makes sense that the coverage's price must be higher than on voluntarily purchased insurance to account for a higher risk — if a hurricane comes through, a homeowner with a stake in a property is more likely to board up the windows than one in foreclosure. In many states regulators provide at least some oversight and limits on acceptable rates. Moreover, force-placing insurance isn't optional for servicers: investor contracts usually require it.

"Realistically, we're doing whatever investors are telling us to do," Vidal said.

But it would be possible for servicers to treat force-placing as a last-ditch form of investor protection conducted at the lowest cost possible. Instead, they have consistently chosen force-placed insurance deals that reward themselves at the expense of their clients — and have sometimes given insurers unfettered access to write policies on their portfolios. Banks have put little effort into justifying their force-placed practices because they were rarely asked about them.

"[T]he cost may be considerably more expensive than insurance you can obtain," says a September letter from SunTrust Banks Inc.'s mortgage unit to a borrower, which cites the baffling — but often repeated — line that high prices are necessary because the policy is underwritten "without inspection." (As a general matter, insurers do not routinely inspect residential properties in the course of underwriting, according to Thompson of the National Consumer Law Center, though a representative of one large insurer told American Banker that it always reserves the right to.) SunTrust declined to comment for this story.

Such practices have been in place for years, yet force-placed insurance has received very little attention outside of the servicing industry. Given the current volume of foreclosure activity and the unprecedented attention that ground-level servicing operations are now receiving, however, that could change.

The Dodd-Frank Act stipulates that charges for force-placed insurance must be "bona fide and reasonable," and correspondence with the National Association of Insurance Commissioners suggest that state regulators are aware of the potential for conflicts of interest in insurer selection. Asked whether pricing in the field is competitive, a representative of the NAIC responded that servicers have "no incentive to select a competitively priced product, but instead would be more

concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction."

In response to a query by American Banker on possible interest in the force-placed insurance market, the Office of the U.S. Trustee, which oversees bankruptcy trustees and the administration of cases, referred without comment to an Indiana bankruptcy case in which it has asked Wells Fargo to produce documents "that support the belief that Debtors had failed to maintain insurance" and "premium notices; invoices; canceled checks; policies of insurance; insurance binders; and, requests for quotes or bids for insurance."

Wells is obligated to respond later this month.

Neither the U.S. Trustee's query of Wells nor the views of other regulators have filtered down to ground-level servicing practices, said consumer advocates like Thompson.

Golant, who hopes to begin deposing insurance industry officials in his force-placed cases within a few months, said he didn't believe the industry would willingly accept change.

"The banks' profits aren't connected to the performance of the loan," he said. "The people making policy, thinking the servicers are part of the solution to the foreclosure problem, need to understand that."



© 2011 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.