

1 of 1 DOCUMENT

Copyright 2011 Congressional Quarterly, Inc.
All Rights Reserved.
CQ Congressional Testimony

July 28, 2011 Thursday

**SECTION:** CAPITOL HILL HEARING TESTIMONY

**LENGTH:** 2374 words

**HEADLINE:** INSURANCE OVERSIGHT;
**COMMITTEE:** HOUSE FINANCIAL SERVICES;
**SUBCOMMITTEE:** INSURANCE, HOUSING AND COMMUNITY OPPORTUNITY

**BODY:**

TESTIMONY-BY: BIRNY BIRNBAUM, EXECUTIVE DIRECTOR

AFFILIATION: CENTER FOR ECONOMIC JUSTICE

Statement of Birny Birnbaum Executive Director Center for Economic Justice

Committee on House Financial Services Subcommittee on Insurance, Housing and Community Opportunity

July 28, 2011

Chairman Biggert, Ranking Member Gutierrez and members of the Subcommittee, my name is Birny Birnbaum. I am the Executive Director of the Center for Economic Justice, a non-profit organization advocating on behalf of consumers on insurance, credit and utility issues. I have been intimately involved in insurance regulatory policy issues for 20 years as a regulator and as a consumer representative. I have been an active participant at the National Association of Insurance Commissions (NAIC) and the National Conference of Insurance Legislators (NCOIL) for many years.

The vast majority of state insurance regulators - particularly those in market regulation - are incredibly dedicated to consumer protection. I have had the honor of working with hundreds of these state insurance regulators over the past 20 years. But these regulators are limited by a lack of essential tools - data for market analysis - and by a regulatory structure that favors insurers over consumers. There are some clear actions states can take to level the insurance regulatory playing field and make regulators and insurers more accountable to consumers.

My testimony today will cover:


PLAINTIFF'S EXHIBIT 13

Accountability and Responsiveness of Insurance Regulators and Insurers to Consumers

The Limitations of State Insurance Market Regulation Efforts

The Dodd Frank Requirements for Studies of Insurance Availability

Problems with Force-Placed Homeowners Insurance

Accountability of Regulators and Insurers to Consumers

The insurance regulatory system has limited accountability to consumers and routinely favors insurance industry interests over consumer interests. There is a tremendous imbalance in the ability of the insurance industry - versus consumers - to influence insurance regulatory policy and regulatory performance. The insurance industry spends hundreds of millions of dollars of funds provided by consumers - paid as part of the insurance premiums - to lobby regulators and legislators at the NAIC, NCOIL and in individual states. In the vast majority of states, there are no consumer organizations focusing on insurance issues other than health insurance. So, for the vast majority of regulatory issues, there are no consumer perspectives to balance out the many industry voices pushing for the industry policies. Even when there is a consumer voice, it is typically outnumbered and outspent by massive amounts.

Today's hearing is an example of this imbalance. Six industry representatives representing nine industry trade associations are testifying today. I am the sole consumer representative. The absence of consumer insurance advocates - individuals and institutions with resources necessary to participate in the regulatory process - contributes to an insurance regulatory system that is far more accountable to industry than to consumers. This is most pronounced for state insurance regulatory administrative actions - rulemaking, enforcement and market surveillance. Industry has virtually unlimited funds to press their views and fund research to serve their cause - funds provided by policyholders from premium payments. As a result, insurance regulatory policy and actions routinely favors insurers over consumers.

The regulatory bias towards industry is exacerbated by weak conflict of interest requirements regarding movement of regulators to industry. When regulators leave public service, the vast majority go to work for the industry they regulated - often lobbying their former colleagues on behalf of industry. Few go to work on behalf of consumers because there are few jobs available for insurance consumer advocates.

To level the playing field and make insurance regulation more accountable to consumers, insurers should be prohibited from including lobbying expenses in insurance premiums. Alternatively, insurers should be required to obtain affirmative agreement - opt- in - by consumers for use of premium dollars for lobbying. In addition, there should be mechanisms in place to fund independent insurance consumer advocates. There are a number of models for this, ranging from state agencies like the Texas Office of Public Insurance Counsel to consumerfunded Consumer Insurance Boards. Of course, conflict of interest requirements should also be strengthened to ensure that today's regulatory actions are not influenced by tomorrow's job prospect.

Another critical tool to improve the accountability of insurers and regulators to consumers is the public availability of insurer market performance data - the insurance equivalent of Home Mortgage Disclosure Act Data.

State Insurance Market Regulation

Market regulation is the term used to describe regulators' activities to monitor insurance markets, identify market problems and consumer abuses and remedy those problems. Although one of the most oft-heard arguments for state-based insurance regulation is that the states better understand and are closer to their markets than a federal regulator, the fact is that state regulators have a poor track record of identifying the worst market problems. Indeed, many of the worst insurance consumer abuses were identified by others - state attorneys general, news media or consumers going to lawyers for assistance.

Case 3:12-cv-00768-DRH-PMF   Document 2-13   Filed 07/06/12   Page 3 of 5   Page ID #155

Page 3
INSURANCE OVERSIGHT; COMMITTEE: HOUSE FINANCIAL SERVICES; SUBCOMMITTEE: INSURANCE, HOUSING AND COMMUNITY OPPORTUNITY CQ Congressional Testimony July 28, 2011 Thursday

The list of market problems not identified by state insurance regulators is impressive:

Bid Rigging Associated With Contingent Compensation of Brokers

Homeowners and Auto Insurance Redlining

Financed Single Premium Credit Insurance Sold With Real Estate Loans

Churning of Life Insurance Policies

Unsuitable Sales of Annuities to Seniors

Life Insurer Claim Settlement Practices and Retained Asset Accounts

Unfair Underwriting and Rating Factors

The limitations of state insurance market regulation have been recognized by the Government Accountability Office (GAO) and by Congress. The GAO has issues several reports examining state insurance regulation. In a 2003 report1, the GAO stated: While all states do some kinds of market regulation, including issuing licenses and responding to consumer complaints, two key tools market analysis and on-site examinations are used inconsistently, if at all. The result is inconsistent and often spotty coverage from state to state and potential gaps in consumer protection. Formal and rigorous market analysis, which could be used to determine which companies to examine and how broad the examination should be, is in its infancy among state regulators, and states that do perform examinations vary widely in the way they choose companies to examine and the scope of the examinations they conduct.

These inconsistencies in performing market conduct examinations make it difficult for the states to depend on each other for regulation, leaving each state with the virtually impossible task of examining every company within its borders. And with each state conducting its own examinations, some insurance companies find themselves undergoing simultaneous examinations by several states, while other companies may not be examined at all. In a follow up report in 20092, the GAO found limited improvement and stated, "NAIC and the states have taken steps to improve reciprocity and uniformity of market regulation, but variation across states has limited progress."

Congress has also taken note of the states' failure to examine insurance markets for unfair discrimination. In the 2003, Congress passed the Fair and Accurate Credit Transactions Act, which required the Federal Trade Commission, in consultation with the Office of Fair Housing and Equal Opportunity of HUD to study the effects of credit-based insurance scores on the availability and affordability of property and casualty insurance, the statistical relationship between credit-based insurance scores and actual losses, and the extent to which credit-based insurance scores are a proxy for prohibited factors, such as race, color, or religion. Despite being responsible for regulating insurers' use of consumer credit information for underwriting and rating, state regulators have collected very little information on, for example, the impact of the great recession on insurance scores and premiums.

More recently, in the Dodd Frank Act, Congress created the Federal Insurance Office (FIO) and authorized the FIO to monitor the extent to which traditionally underserved communities and consumers, minorities and low- and moderate-income persons have access to affordable insurance products regarding all lines of insurance, except health insurance. Congress also gave the FIO the authority to collect data from insurers, to the extent the data is not already collected by state insurance and other regulators.

These directives by Congress are a result of the failure of state insurance regulators to collect meaningful market performance data about insurers. Currently, state regulators receive and review consumer complaints and have started to collect a few pieces of data through the Market Conduct Annual Statement (MCAS). But these data are grossly inadequate for rigorous market surveillance and analysis. The absence of consumer complaints is not a reliable indicator of fair treatment of consumers; some market problems did not produce consumer complaints because the consumer was

not aware of the problem (bid rigging/broke compensation, retained asset accounts) or did not know to file a complaint with the insurance department. The MCAS, which has great potential to assist regulators in improving market regulation, fails to meaningfully help regulators because there are so few data elements and the data elements collected are so highly summarized.

The failure of state insurance regulators to collect - and publish - insurer market performance data contrasts starkly with market performance data available to regulators and the public for mortgage and other lending through the Home Mortgage Disclosure Act (HMDA). With HMDA, lenders report information on all loan applications and resulting loans. The availability of HMDA data allowed fair lending organizations to identify predatory lending abuses in the subprime mortgage market as early as the late 1990's and the reckless mortgage lending practices that led to the financial crisis of 2008 in the early 2000's. One of the most important actions state insurance regulators can take to improve market regulation, consumer protection and accountability of insurers and regulators to the public is to collect and publish detailed market performance data about individual insurers in the same way that HMDA data are collected and published for lenders' market performance.

Force-Placed Insurance

Lender-placed insurance (LPI) is also known as force-placed insurance, is insurance placed by a lender on collateral supporting a consumer loan in the event the borrower fails to maintain required insurance coverage. For example, a mortgage lender will require property insurance to protect the real estate serving as collateral for the loan. Lenders (or, more typically, the insurer providing the LPI and administering the program for the lender) monitor the insurance status of the property and auto loans to ensure the required insurance is in place. If the lender or insurer/program administrator determines the insurance is not in place, an insurance policy (or certificate on a group policy) is issued to cover the property or auto. The cost of the force-placed insurance is added to the loan.

The incentives and potential for abuse in the administration of LPI are great. Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage.

With the great problems in the mortgage market and the crushing impact on low- and moderateincome consumers of the recession caused by the financial market collapse, the amount of forceplaced homeowners insurance has exploded in recent years. According to Credit Insurance Experience Exhibit (CIEE) Data, insurers wrote $1.5 billion of gross premium in 2004. By 2009, that amount had grown to over $5 billion and, in 2010, LPI gross written premium grew to over $5.5 billion.

The prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission - totaling hundreds of millions of dollars - out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral. The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance - so the lenders' cost of tracking all loans is passed only to those consumers paying for forceplace insurance.

The problems with force-placed insurance illustrate a number of state regulatory failures. In this instance, regulators collect the data to indicate a problem with overcharges. But, state regulators have not taken action on their own initiative to reduce the rates for LPI. The problems with LPI have been brought to regulators' attention - at NAIC meetings and in correspondence with individual state regulators - but regulators have not taken action in response to the problems raised by consumers. Problems other than excessive rates were not identified by regulators, but by reporters[3] and consumer representatives because regulators collect no data on the sales practices and servicing practices of the handful of insurers writing the vast majority of the LPI business.

Page 5
INSURANCE OVERSIGHT; COMMITTEE: HOUSE FINANCIAL SERVICES; SUBCOMMITTEE: INSURANCE, HOUSING AND COMMUNITY OPPORTUNITY CQ Congressional Testimony July 28, 2011 Thursday

While the problems with insurance market regulation are significant, there are some clear actions, as described in my testimony, states can take to level the insurance regulatory playing field and make regulators and insurers more accountable to consumers.

LOAD-DATE: July 28, 2011